## McDONOUGH et al. v. OWL DRUG CO. et al.
### No. 7485.

Circuit Court of Appeals, Ninth Circuit.
Jan. 28, 1935.
Rehearing Denied March 4, 1935.

The allegations of plaintiffs' petition, directed to be printed by the court, are as follows:

I. That each of the petitioners now is and during all times herein mentioned was a stockholder in the Owl Drug Company, and is now and at all times hereinafter mentioned was the owner of record on the books of said company of the number of shares of preferred stock respectively set opposite his name in Exhibit "A" hereto attached, hereby referred to and made a part hereof for all purposes.

II. That the United Drug Company is now and at all times hereinafter mentioned was a corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

III. That petitioners are informed and believe and therefore aver that Drug Incorporated at all times herein mentioned, and up to September 25th, 1933, was a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, and that during all times herein mentioned up to September 25th, 1933, it was the owner of all of the capital stock of Sterling Products, Inc., a corporation, Bristol Myers Company, a corporation, Life Savers Corporation, a corporation, Vick Chemical Inc., a

corporation, and of the United Drug Company, a corporation, the corporation above referred to. That on or about the 25th day of September, 1933, Drug Incorporated dissolved and distributed to its stockholders the shares of stock in the aforesaid corporations held by it.

IV. That on or about January 1st, 1930, and at the time of the acquisition by Drug Incorporated, as hereinafter set forth, of the common stock of the said bankrupt the issued and outstanding stock of the said bankrupt consisted of 40,000 shares of common stock, all of which was acquired by said Drug Incorporated on or about January 1st, 1930, and 60,000 shares of the (4) preferred stock, but said preferred shares did not and do not carry the right to vote or give the owners thereof any voice or power in the control of any one of the affairs of said bankrupt company, but the sole and exclusive power of dictating and controlling all of the activities of said company up to the time of its bankruptcy was held and exercised by Drug Incorporated by virtue of its ownership of said common stock, and said Drug Incorporated elected and caused to be elected all of the directors of said bankrupt, and said directors ever since their election as such directors and up to the time of the adjudication in bankruptcy of said company have acted as the agents of Drug Incorporated solely in accordance with its wishes and directions in all things. That at the time of the acts herein referred to and at the time of the filing of the application of said bankrupt herein to be adjudicated a bankrupt, and at the time of the proceedings in bankruptcy hereinafter referred to, one W. M. Berg, was the president of the said bankrupt, and J. S. Alley, H. L. Hagen, H. E. Masters, J. W. Porter, and N. L. Vermilya were the duly elected, qualified and acting directors thereof and composed the directors thereof, and one G. F. Pfaffenberger was the general manager of said bankrupt.

V. That the entire issue of the stock of said United Drug Company ever since January 1st, 1930, and up to September 25th, 1933, was owned and controlled by the said Drug Incorporated and said United Drug Company was, during all of said times, a subsidiary and agent of said Drug Incorporated and was controlled by it by means of stock ownership and interlocking directors, and during all of said times it was used and controlled by said Drug Incorporated as the instrumentality of the latter in carrying out the plans and creating the conditions herein-after (5) described, and said United Drug Company during said time was operated under a common control with said Drug Incorporated for the purpose of appropriating to themselves and their stockholders the entire business, assets, property and goodwill of the said bankrupt.

VI. That for a period of twenty years previous to the acquisition by said Drug Incorporated, of the controlling interest aforesaid in the stock of said bankrupt company, the latter company had conducted a profitable and rapidly growing business, and for a period of ten years previous to the acquisition of said stock it had earned net profits of over Six Million Dollars ($6,000,000) or an average of about one hundred seventy-seven thousand dollars ($177,000) each year over and above the eight per cent (8%) dividend on its entire issue of preferred stock, and by reason thereof said preferred stock had a market value of over one hundred dollars ($100) per share and was readily saleable at that price, but since the acquisition of said common stock by said Drug Incorporated, its net earnings have ceased and it has conducted its business at a loss, and the value of said preferred stock has been destroyed by the acts of United Drug Company, Drug Incorporated, and the officers and directors of said bankrupt, which acts are herein described.

VII. That during the said period of twenty years mentioned in the last preceding paragraph hereof, said bankrupt had established itself as the leading manufacturer and retailer of drugs and druggists' sundries in the Middle West and in the Pacific Coast States and its only competitor in those districts during said period was the defendant, Drug Incorporated, and its said subsidiaries, and constant competition existed between (6) them and said bankrupt with the advantage overwhelmingly in favor of said bankrupt, which advantage was due to the fact that said bankrupt had its factories close to its principal retail stores and also produced a superior quality of goods which had become favorably known to the public and said bankrupt had acquired the good will of the trade which was reasonably worth, and conceded to be worth, the sum of Ten Million Dollars ($10,000,000) and said bankrupt had from time to time secured the most valuable locations for its retail stores in the cities in which it was selling its goods, which locations were practically the only available locations which could be secured at rentals which would permit of prof-

its in its retail business, and it had also established a large drug manufacturing plant in the City and County of San Francisco, California, and one in New York City, by means of which manufacturing plants it was enabled to and did get control of the jobbing drug business for which it was competing with said Drug Incorporated, and undersold all its competitors, including said Drug Incorporated, and eighty per cent (80%) of the profits earned by said bankrupt were due to the ownership and operation of the said manufacturing plants and the sale of its products through the retail stores owned and conducted by it, and also by selling its products at wholesale to the trade generally, and the general situation between the bankrupt and Drug Incorporated, and its subsidiaries, in the territory in which they operated was such that the bankrupt was the dominating company and had control of the drug business and was highly prosperous and successful and was continually extending and increasing its business.

VIII. That plaintiffs are informed and believe and therefore aver that on or about the 1st day of January, 1930, and at or about the time that Drug Incorporated acquired the entire (7) issue of the common stock of the said bankrupt it entered into an arrangement, conspiracy, plan and design with the directors and managing officers of said bankrupt, to-wit, W. M. Berg, J. S. Alley, H. L. Hagan, H. E. Masters, J. W. Porter, N. L. Vermilya and G. F. Pfaffenberger, and with the United Drug Company and with Louis K. Liggett Company, since adjudged a bankrupt, to appropriate to themselves and in particular to the United Drug Company all the property, assets and goodwill of said bankrupt and to destroy said company as a going concern and prevent it from carrying on business in competition with said United Drug Company, Louis K. Liggett Company and the other above named subsidiaries of Drug Incorporated, and for the purpose of using the retail stores of the said bankrupt as outlets and sales agencies of the goods manufactured and dealt in by the said subsidiaries of Drug Incorporated and by the said Louis K. Liggett Company, all of the capital stock of which before its bankruptcy was owned by the said Drug Incorporated, or by one of its other subsidiaries to the exclusion of all goods manufactured or dealt in by said bankrupt, and for the purpose of acquiring the business, assets and goodwill of said bankrupt for themselves and for the purpose of destroying the interest of the preferred stockholders in and to the business, assets and goodwill of said bankrupt caused the said bankrupt to be adjudged a bankrupt and to have its property, assets, business and goodwill disposed of to them at a trustee's sale in bankruptcy and in pursuance of said arrangement, plan, design and conspiracy the said directors and officers of said bankrupt and the said Drug Incorporated, the United Drug Company and Louis K. Liggett Company did unlawfully, fraudulently and negligently do and perform, or cause to be done and performed, the acts, matters and things hereinafter in this petition set forth, and particularly the following acts: (8)

(a) They physically wrecked and dismantled said manufacturing plant at San Francisco and destroyed the wholesale and manufacturing business and capacity of said Owl Drug Company, and transferred the goods and equipment of said plant which were reasonably valued at five hundred thousand dollars ($500,000.00) to said United Drug Company, and forced the bankrupt completely out of business as a manufacturing and wholesale concern; they transferred to said United Drug Company without consideration, the drug manufacturing plant which said bankrupt owned, maintained and operated at New York City by means of a corporation called the Remiller Company, Incorporated, the stock of which was owned by said bankrupt, and the business and assets of said Remiller Company of the reasonable value of over One Hundred Thousand Dollars ($100,000.00) are now in the possession of said United Drug Company, and are being used for the use and benefit of said Drug Company, Incorporated, and its co-conspirators; they also caused to be transferred to said Liggett Company the retail drug stores owned and operated by said bankrupt in the Middle West, which stores were well located and making profits and were valuable assets of said last-named company, and in return therefor they transferred to said bankrupt thirty-six (36) drug stores which were owned and operated by said Liggett Company in the Pacific Coast States, which stores were and are poorly located and were not, and are not, earning profits and cannot earn profits, and many of which have been abandoned and are unoccupied, but the rent of which must be paid by said bankrupt; they also caused to be transferred to said bankrupt divers leases for storerooms, the reserved rent in which is much more than the rental value of the

property described in said leases, and they caused said bankrupt to assume the obligations of said leases at a great loss to said bankrupt, but to the great benefit of said Liggett Company, and (9) thereby transferred to said Liggett Company leases of great value in return for leases which were burdensome and unprofitable.

(b) That previous to the time when said Drug Incorporated obtained control of the stock of said bankrupt, the latter company had for many years been manufacturing and selling to the public in large quantities many different articles and proprietary drugs and medicines which had become well and favorably known to the public and which were in large demand and were identified with the name and reputation of said bankrupt, the sale of which goods was very profitable, and the trade built up in those goods was extremely valuable and contributed largely to the financial success and prosperity of said bankrupt, and the continuance of the sale of said goods was necessary to the success of said bankrupt, but notwithstanding said facts Drug Incorporated, W. M. Berg, J. S. Alley, H. L. Hagan, H. E. Masters, J. W. Porter, N. L. Vermilya, G. F. Pfaffenberger, United Drug Company and Louis K. Liggett Company caused the business of said bankrupt to be conducted in such manner as to cause said goods to be withdrawn from the attention and notice of the public and to substitute in their place goods manufactured by said Drug Incorporated and its subsidiaries, and to destroy the trade and goodwill of said bankrupt and transfer it, as far as possible, to the said Drug Incorporated and its subsidiaries.

(c) That the principal profits in the drug business come from the manufacturing end and said Drug Incorporated and its subsidiaries, after it obtained control of said bankrupt, as aforesaid, supplied said bankrupt with goods from their own manufacturing plants at a great profit to themselves, and fixed the prices which said bankrupt must pay in such way as to make the transactions of great profit to the manufacturer and very little profit, if any, to the bankrupt, and by virtue of their (10) control over the said bankrupt United Drug Company and Drug Incorporated acted until the bankruptcy therein referred to as both seller and buyer and thereby appropriated the profits to themselves to the exclusion of the buyer, and they compelled the employees of said bankrupt to push the sale of the Liggett products and the United Drug Company products to the exclusion of the products produced by, or

identified with, said bankrupt with which the public is familiar.

(d) They caused and allowed the said bankrupt to become greatly indebted to the United Drug Company and other subsidiaries of the said Drug Incorporated in excess of the sum of $1,500,000.00 for goods sold by said United Drug Company and said other subsidiaries to the bankrupt as aforesaid in place of allowing the bankrupt to manufacture and sell goods previously manufactured and sold by it, which said indebtedness would not have been incurred had it not been for the destruction and disposal of said manufacturing plants and the other acts of said Drug Incorporated, W. M. Berg, J. S. Alley, H. L. Hagan, H. E. Masters, J. W. Porter, N. L. Vermilya, G. F. Pfaffenberger, United Drug Company and Louis K. Liggett hereinbefore related.

IX. That petitioners are informed and believe and therefore aver that on or about the 9th day of February, 1932, one W. W. Hindman the owner of 314 shares of said preferred stock of said bankrupt commenced an action in the Superior Court of the State of California in and for the County of Los Angeles on behalf of said bankrupt against said bankrupt, United Drug Company, Louis K. Liggett Company, Drug Incorporated, W. M. Berg, J. S. Alley, H. L. Hagan, H. E. Masters, J. W. Porter, N. L. Vermilya and G. F. Pfaffenberger for said sum of Fifteen Million Dollars ($15,000,000.00) and for an accounting by said defendants in (11) said action of their management of the properties and affairs of said bankrupt. That thereafter said defendants filed answers to the complaint on file therein, and thereafter and in pursuance of said plan, design, arrangement and conspiracy, as aforesaid, said defendants and said Hindman purported to settle said action by giving to the said Hindman the sum of $30,000.00 as and for his attorney's fees in said action, the said Hindman being at that time an attorney at law and admitted to practice in all the courts of this state and by causing the said United Drug Company, one of the defendants in said action, to release the said bankrupt from $500,000.00 of the said purported debt created by said defendants, as aforesaid, as part of said plan, design, arrangement and conspiracy in favor of the United Drug Company and the other subsidiaries of said Drug Incorporated and against the bankrupt, and by offering to preferred stockholders of the bankrupt, one share of Drug Incorporated which then had a value on the New York Stock Exchange of approximate-

ly $40.00 a share for every 2½ shares of said preferred stock of said bankrupt. That the said Hindman and the said conspirators as part of said plan, design, conspiracy and arrangement as aforesaid and for the purpose of securing a purported judgment in said action which would be binding and conclusive upon any other stockholder of said bankrupt who might thereafter commence an action against the said defendants on behalf of said bankrupt for an accounting for the damage suffered by it from the acts of said defendants as aforesaid agreed together to secure a decree of the said Superior Court in the said action approving the purported settlement and discharging the said defendants from any and all claims which the said bankrupt might have against them arising out of the matters and things related in said complaint. That the said decree was secured by consent and was collusive and was procured in (12) pursuance of the said plan, design, arrangement and conspiracy, and that the purported settlement approved thereby was not for the benefit of the said bankrupt but was for the benefit of the said plaintiff in said action, W. W. Hindman, and of such stockholders of said bankrupt as were willing to make said exchange of stock and for the benefit of the said defendants therein, and that in truth and in fact the said bankrupt did not receive any benefit of any kind by reason of said settlement, and by reason of said decree.

X. That petitioners are informed and believe and therefore aver that thereafter holders of 51,997 shares of the preferred stock of said bankrupt transferred the shares to said Drug Incorporated and received in return therefor one share of the capital stock of said Drug Incorporated for every 2½ shares of said preferred stock so transferred, and thereafter and at the time of the dissolution of said Drug Incorporated transferred said 51,997 shares to the Sterling Products, Inc., one of its subsidiaries and that said Sterling Products, Inc., is now and ever since the dissolution of said Drug Incorporated has been under the control and management of the United Drug Company. That the holders of the remainder of said 60,000 shares of preferred stock of said bankrupt not so transferred to Drug Incorporated, as aforesaid, to-wit, 8,003 shares thereof, refused to agree to the said purported settlement and refused to make the said exchange and still own and hold their said shares of stock.

XI. That after the said exchange had been completed and upon the refusal of said other stockholders to make said exchange, as aforesaid, and as a part of said plan, design, arrangement and conspiracy the said United Drug Company and (13) Drug Incorporated and the said officers and directors of said bankrupt caused the said bankrupt on or about the 10th day of October, 1932, to file a petition in this court to be adjudged a bankrupt although the business and assets of said bankrupt were all in California and none of them located in Nevada. Thereupon and upon the request of and petition of said bankrupt which was then and there under the domination and control of said United Drug Company and said Drug Incorporated and said officers and directors of said bankrupt, this court made its order, judgment and decree adjudicating the said Owl Drug Company a bankrupt and appointing one George K. Edler trustee in bankruptcy of said bankrupt. That at the time of the filing of said petition to be declared a bankrupt and at the time of said adjudication said Owl Drug Company was not insolvent. That at that time the fair value of its business and assets exceeded $8,000,-000.00. That at that time its indebtedness including the fictitious claims against it of the United Drug Company and Drug Incorporated and its subsidiaries, which were created in the manner herein described were not in excess of the sum of $4,000,000.00 and at least fifty per cent (50%) of this indebtedness was composed of fictitious indebtedness to United Drug Company and other subsidiaries of Drug Incorporated and United Drug Company which was created as aforesaid by the wrongful acts of said United Drug Company, Drug Incorporated and said directors and officers of said bankrupt and was illegal and void and but for these wrongful acts would never have existed. That said adjudication in bankruptcy was collusive and caused by the United Drug Company, Drug Incorporated and the officers and directors of said bankrupt for the purpose of carrying out the plan, design, conspiracy and arrangement herein referred to. (14)

XII. That after the appointment of the said trustee, the said trustee gave notice in the manner provided by law of the sale by him of the business and assets of said bankrupt which said notice called for bids for the purchase of said business and assets. That at or about the time of the giving of said notice the said United Drug Company and said Drug Incorporated and said officers and directors of said bankrupt caused a corporation to be formed under the laws

of the State of Nevada known as the Union Holding Company, Inc. That on or about the 22nd day of September, 1933, the said Union Holding Company, Inc. purchased from the trustee all of the business and assets of said bankrupt for the sum of $1,550,-000.00. That at the time of the formation of said Union Holding Company, Inc. and at the time of said purchase the directors of said Union Holding Company, Inc. were Louis J. Hunter, who was then and there a representative of United Drug Company, W. M. Berg, N. L. Vermilya, H. L. Hagan, and one Donald Lamont. That the said W. M. Berg, N. L. Vermilya and H. L. Hagan were then and there officers and directors of the said bankrupt as aforesaid, and the said Donald Lamont was one of the attorneys for said bankrupt. That said officers and directors of said Union Holding Company, Inc. were at the time of said bankruptcy operating the said business and assets of said bankrupt and were at the time of the purchase operating the said business and assets of said bankrupt as the former officers and directors of said bankrupt under the said trustee. The said Union Holding Company, Inc. immediately after the said purchase changed its name to The Owl Drug Co. That it and its officers and directors as aforesaid continued the operation of the said business and assets of said bankrupt and now are continuing the operation of the business and assets of said bankrupt under the name of The Owl Drug Co. without any cessation (15) of said business or any break in the operation thereof, but with the assets, business, going-concern value and goodwill thereof free and clear of all interests of said preferred stockholders. That the said bankruptcy proceedings and the said sale and the said purchase by the Union Holding Company, Inc. were all part of the said plan, design and conspiracy as aforesaid, and were all accomplished for the purpose of consummating said plan, design and conspiracy as aforesaid, and of defrauding the said preferred stockholders of their interest in said business and assets. That in order to prevent other persons, firms and corporations from bidding for said business and assets of said bankrupt and to secure unto the said United Drug Company and the other subsidiaries of Drug Incorporated and unto said officers and directors of said bankrupt the said business and assets of said bankrupt for said sum of $1,550,000.00, and as part of said plan, design and conspiracy as aforesaid, these petitioners are informed and believe and therefore aver that the said United Drug Company and the said officers and directors of said bankrupt notified all other bidders that the United Drug Company and other subsidiaries of Drug Incorporated were prepared to overbid any other bidder for said business and assets, and that it would be useless for any other party to attempt to purchase said business and assets and the said United Drug Company and the said officers and directors of said bankrupt and said Union Holding Company, Inc. stifled open bidding for said business and assets and shut off competition in bidding for said business and assets.

XIII. That these petitioners contemplate the commencement of an action in the Superior Court of the State of California in and for the City and County of San Francisco against said Union Holding Company, Inc., now known as The Owl Drug Co., and against (16) the officers and directors thereof and against the United Drug Company and on behalf of the said bankrupt for a decree of said court adjudging that the said business and assets of said bankrupt are held by said The Owl Drug Co. in trust for said bankrupt and for a judgment and decree of said court requiring said Union Holding Company, Inc., now known as The Owl Drug Co. to convey to said bankrupt said business and assets so illegally obtained by it, and for a judgment against said Union Holding Company, Inc., and said officers and directors thereof, and against the said United Drug Company for damages for the injuries suffered by said Owl Drug Company by reason of the acts herein complained of. That it is necessary in order to receive the relief applied for in the said contemplated action that the said order and decree of this court adjudicating the said Owl Drug Company a bankrupt be vacated and set aside.

Wherefore, these petitioners pray this court for an order thereof vacating said order and decree adjudicating the said Owl Drug Company a bankrupt, and dismissing said bankruptcy proceedings, and for such other and further relief as to this court may seem equitable and meet.

Herbert W. Erskine, Bertram H. Ross, Joseph E. Bien, Samuel T. Bush, and William H. Penaat, all of San Francisco, Cal., for appellants.

William M. Kearney, of Reno, Nev., and John Francis Neylan, Bartley C. Crum, and Chickering & Gregory, all of San Francisco, Cal., for appellee Owl Drug Co.

Thatcher & Woodburn, Geo. B. Thatcher, Wm. Woodburn, and Wm. J. Forman,

all of Reno, Nev., and Clarence A. Shuey and Grant H. Wren, both of San Francisco, Cal., for appellee Edler, trustee.

Before GARRECHT, Circuit Judge, and WEBSTER, District Judge.

WEBSTER, District Judge.

Appellants, preferred stockholders of the Owl Drug Company, a corporation, organized under the laws of the state of Nevada, are prosecuting this appeal from an order or judgment of the District Court for the District of Nevada—the Honorable Jeremiah Neterer presiding—dismissing, on motion of the appellees, appellants' petition praying that the order of the District Court adjudging the Owl Drug Company a bankrupt be set aside and annulled upon the ground that such adjudication had been procured by extrinsic fraud and that the District Court was being used as an agency or instrumentality through the mediumship of which the alleged fraudulent scheme or enterprise was being carried to consummation. It is conceded by appellants, through their counsel, that the United States District Court for the District of Nevada was a court of competent jurisdiction to entertain the voluntary petition in bankruptcy filed by the Owl Drug Company, and that under the conditions then disclosed to the court there was no alternative but to make the adjudication of bankruptcy now sought to be set aside.

The sole claim of appellants is that because of after-discovered fraud on the part of the bankrupt and its controlling stockholder, the order of adjudication should be canceled. The petition filed by appellants contains many general and indefinite allegations, some of which are based on information and belief, as well as many conclusions, both of fact and law. In effect it is alleged in the petition substantially that the voluntary bankruptcy of the Owl Drug Company was part of, or a step in, a preconceived plan or scheme by the controlling stockholder of that company to acquire the interests of appellants and some other preferred stockholders of the company; that this scheme was being carried into effect by causing the bankrupt company to file a voluntary petition in bankruptcy in the District Court of Nevada at a time when the fair value of the company's assets exceeded its liabilities, and by causing a purchase to be made of the entire assets of the bankrupt company by a subsidiary corporation of the bankrupt at the bankruptcy sale of such assets; that prior to such bankruptcy the controlling stockholder of the bankrupt company had, by certain transactions and manipulations, caused the subsidiary companies of such stockholder to be fraudulently and unjustly enriched at the expense of the bankrupt company and its stockholders; that appellants contemplated the bringing of a suit against the subsidiaries of the bankrupt company and its controlling stockholder on behalf of the bankrupt company to recover damages for the alleged wrongful and fraudulent acts of such controlling stockholder, and also to have the property of the bankrupt company, purchased at the bankruptcy sale, declared to be held in trust for the benefit of the bankrupt company; and that in order for appellants, as preferred stockholders of the bankrupt company, to maintain such a suit or action, it is necessary that the offending adjudication of bankruptcy be annulled. Since the petition was dismissed on motion of the appellees-defendants, and in order to promote a full and clear understanding of the controversy, the petition, omitting formal parts, will be set forth at length.

In ruling upon the motion to dismiss the petition, the trial court held that all matters of fact properly pleaded in the petition stood admitted for the purpose of the motion; that conclusions of law and generalizations and characterizations of fact were not so admitted; and that in passing upon the motion it was permissible for it to take judicial cognizance of the records and files of the bankruptcy proceeding in which the petition was filed. This ruling clearly was correct. Ben C. Jones & Co. v. West Publishing Co. (C. C. A.) 270 F. 563–565; Hutton v. Joseph Bancroft & Sons Co. et al. (C. C.) 83 F. 17–19.

We are not dealing with a case where, on consideration of a demurrer at law or motion to dismiss in equity, the court goes outside and takes judicial notice of matters wholly extrinsic to the record of the proceeding in which the ruling was made. Here the petition under review was filed by appellants in the bankruptcy proceeding, and it would be going far to say that, in exercising discretionary powers to protect itself against fraud, a court may not take judicial cognizance of the very proceedings in connection with which its action is invoked. During the course of the argument in the court below, and after the court had indicated its purpose to sustain the motion to dismiss the petition upon the ground of

laches, counsel for appellants asked leave of the court to reduce to writing an amendment to the petition, which the appellants wished to be allowed to file. The scope and purport of the proposed amendment was stated by counsel in this language: "We want to amend to show that we had no actual knowledge of the bankruptcy, no actual knowledge of the sale, and no actual knowledge of the fact that the sale took place in pursuance of the fraud which we allege, and no (actual) knowledge of the right or rights of these people until the senatorial hearing took place in San Francisco and was completed some time in December or January, 1933; and that we had no opportunity thereafter to protect ourselves by litigation until we got our petition on file, because the time intervening was consumed in getting the stockholders together and forming the necessary committee and in raising the money to employ attorneys, and thereafter in employing attorneys, and that is what consumed the time, and that is our excuse, as stated in our brief but not stated in our petition, for the intervening delay."

Leave thus to amend was denied and exception taken. This ruling is one of the grounds relied upon by appellants for reversal. In view of our conclusions upon the whole matter, we shall treat the petition as though the proffered amendment had been allowed. From the petition and the record in the bankruptcy proceeding the following pertinent facts appear:

The Owl Drug Company was adjudicated a bankrupt on October 10, 1932; a temporary receiver was appointed and in due course George K. Edler, Esquire, was duly appointed trustee of the bankrupt estate; the administering of the estate has continued ever since the adjudication, and in the course thereof on September 22, 1933, all of the business and assets of the bankrupt were sold pursuant to the order of the court, and the sum of $1,550,000 was realized therefrom, which fund is now in the custody of the court for the benefit of creditors; approximately seventeen months after the adjudication, and five months after the sale, viz., on March 7, 1934, the appellants filed their petition in the bankruptcy proceeding to set aside the order of adjudication; the temporary receivership involved the expenditure of approximately $42,500, the propriety of which expenditures is not challenged; that the trustee in bankruptcy, pursuant to the authorization of the court, operated the business of the bankrupt company, consisting of a chain of one hundred and twenty drug stores located in the states of California, Oregon, Washington, and Utah, and continued these activities until November 30, 1933; that the trustee has adjusted future rentals and leases of the bankrupt's chain of stores and the status of the bankrupt toward its various landlords has been changed, either by a rejection of existing leases or by a change in the terms thereof; that approximately twelve hundred creditors have filed claims against the bankrupt estate, aggregating approximately $10,000,000; that at the time of the filing of appellants' petition, claims aggregating approximately $2,000,000 had been approved and allowed; that after due notice the assets of the estate were sold to the highest bidder for $1,550,000; the sale was duly confirmed without objection of a single creditor, and it was stated without denial at the argument that the creditors expressly consented to such confirmation; the purchase price for the property was paid and the property delivered to the purchaser; that a full report of the operation of the business was filed by the trustee and large sums have been allowed to the trustee's attorneys, which are not challenged in this proceeding, and the trustee had been ordered by the court to pay a dividend of 5 per cent. to creditors; that the aggregate expenditures by the trustee in carrying on the business and administering the estate approximated $140,000; that if the rejected and modified leases on business locations should be reinstated, the bankrupt would be hopelessly insolvent, the appraised value of the property of the bankrupt being $3,100,000, or less than one-third of the amount of the claims filed.

Many additional facts of importance might be recited, but the foregoing will perhaps serve to give an adequate idea of the setting at the time appellants' petition was filed. No creditor of the bankrupt has joined with appellants in seeking to have the adjudication of bankruptcy annulled, but on the contrary the trustee, conceiving that it is primarily his duty to protect the rights of creditors, is vigorously opposing the setting aside of the adjudication. It may be granted that preferred stockholders of a corporation are competent to file a petition in a bankruptcy proceeding attacking an order adjudging such corporation a bankrupt on the ground that such order was procured by fraud and imposition, and may in that manner invoke the incidental equity powers of a court of bankruptcy in the

premises. Such a challenge, however, must be based upon such grounds as will appeal to the conscience of a chancellor and must be seasonably interposed. Zeitinger et al. v. Hargadine-McKittrick Dry Goods Co. (C. C. A.) 244 F. 719; Hanna v. Brictson Manufacturing Co. (C. C. A.) 62 F.(2d) 139–149.

A proceeding of this character is addressed to the sound judicial discretion of the court and must be predicated upon considerations which will appeal to the conscience of a chancellor, and the relief sought will be granted or denied, depending upon what a careful balancing of all pertinent equitable factors dictates to be just. Let it not be forgotten that in liquidating a bankrupt corporation the rights of creditors come first. The interests of corporate stockholders in such proceedings are always secondary and subordinate to the interests of the corporate creditors. Indeed, it is only after the lawful claims of creditors are satisfied that the rights of stockholders attach for practical purposes. Unless there is a surplus over and above the amount necessary to satisfy creditors, there is nothing to which the stockholders may assert any claim. Creditors are the peculiar favorites of courts of bankruptcy. When a court of bankruptcy is asked to assert its incidental equity powers, its action must be governed by precisely the same principles and considerations which would move a chancellor to action. With these elementary principles in mind it does not seem difficult to chart a true course in this case. The learned trial court, in dismissing appellants' petition, stressed the question of laches and palpably, in face of the facts to which we have already adverted, there is much to be said in support of that view. However, we prefer to rest the determination of the controversy upon what we consider to be a broader and a more fundamental ground, viz., the want of equity in the petition in the light of the circumstances of the case in hand. It requires no unusually vivid imagination to picture measurably the consequences which would follow if the adjudication in question should be set aside. No creditor is complaining. No creditor has manifested any dissatisfaction with the adjudication, nor with the steps which have been taken in liquidating the estate. The creditors holding approved claims are relieved from the injurious effects of the onerous long-time leases made under conditions vastly different from those prevailing at the present time. Large sums have been expended in liquidating the estate which would be irretrievably lost if the adjudication should be annulled. The fund of $1,550,000, now in the custody of the court, would be withdrawn from the creditors, and they would be launched upon a sea of chaos and confusion. They would be postponed in the enjoyment of their rights and be subjected to untold hazard, expense, delay, and inconvenience. And all this to the end that preferred stockholders may speculate through protracted litigation, without regard to the hurt of creditors, in the hope that something may be salvaged for themselves. If it be suggested that claims of landlords have been rejected or reduced, the obvious answer is that such landlords are not complaining and appellants cannot be heard to complain in their behalf. If the adjudication should be set aside, the leases of these landlords would automatically be reinstated, and with these claims revived it is too plain for serious discussion that there would not be any surplus over and above the debts to which appellants could assert any claim. In these circumstances it would be inequitable, unconscionable, and unjust to subject the creditors to the evils and hazards which the cancellation of the adjudication would inevitably entail. The creditors of the bankrupt corporation are not involved in the fraud upon which appellants rely. The creditors are as innocent of the wrong complained of as are the appellants themselves. If the allegations of appellants' petition be taken for true, the creditors, like themselves, are the victims of a fraud, not the authors of it. The creditors have done nothing to harm or injure the appellants, and while courts of bankruptcy may, in the exercise of their incidental equity powers, preserve the integrity of their processes and protect themselves against fraud, trickery, and imposition, these powers may not be invoked by one class of litigants to the injury, detriment, or hazard of another class who are themselves blameless, and especially is this true when the class sought to be adversely affected occupy a favored position and who possess rights of superior and paramount dignity to the class seeking the intervention of the court. In relieving against fraud the consequences must be laid at the door of those who perpetrate it.

With respect to the allegations in the petition that the appellees "stifled" the bidding when the assets of the bankrupt corporation were offered for sale, it may be said that no facts are pleaded tending to show any such conduct on the part of the

**54**

appellees. The allegation is a mere naked characterization of facts not pleaded or disclosed. Moreover, appellants are not attacking the sale and seeking to have the property resold at a sale where bidding will be fair and unrestricted. Appellants seek to annul the adjudication of bankruptcy to the end that the entire bankruptcy proceeding shall be a nullity. Obviously such is not the proper remedy for stifling bidding at a judicial sale.

In paragraph 13 of the petition it is alleged that the petitioners contemplate the commencement of certain legal proceedings in the courts of California and that it is necessary, in order to obtain relief, that the decree of the District Court adjudicating the Owl Drug Company to be a bankrupt be vacated and set aside. Such allegation patently is a mere conclusion of law not admitted by the motion to dismiss, and upon the correctness of that conclusion we neither express nor intimate any opinion.

Affirmed.

SAWTELLE, Circuit Judge, participated in the hearing of the above case and the conference thereon and concurred in the result, but died before the opinion was prepared.