**In re OWL DRUG CO.**
No. 480.

District Court, D. Nevada.
Aug. 7, 1936.

William M. Kearney, of Reno, Nev., for bankrupt.

Thatcher & Woodburn, of Reno, Nev., and Grant H. Wren and Clarence A. Shuey, both of San Francisco, Cal., for trustee, George K. Edler.

Walter Rowson, of Reno, Nev., for referee, Felice Cohn.

YANKWICH, District Judge.

As a part of the proceedings for the final distribution of this estate, there are before the court petitions for the allowance of additional fees for the trustee's attorneys and of fees for the bankrupt's attorney, and the approval of the referee's account.

The attorneys for a few of the smaller creditors have filed a formal objection to the allowance to the trustee's attorneys of a fee in excess of $32,500, and of a fee in excess of $7,500 to the bankrupt's attorney. Other small creditors have expressed their disapproval in letters to the referee and to the clerk of the court. The objectors do not represent more than $20,000 in claims.

The representatives of practically all the merchandise creditors and of the larger creditors have approved in open court, and in statements read into the record, the fee of the trustee's attorneys. They have not approved, but have protested, the allowance of the amount asked by the bankrupt's attorney.

(1) *Fees for the Trustee's Attorneys.*

The trustee's attorneys, upon an order dated March 12, 1935, have received $50,000 for services up to November 30, 1933, and other attorneys assisting them have received $5,000. The order signed by the Honorable Jeremiah Neterer contained the following proviso: "Provided, however, that unless services of an extraordinary character are rendered by the attorneys for the Trustee to be determined by the Court, any additional compensation for services herein should be limited to the sum of $25,000.00."

An additional allowance of $45,000 is asked. The services for which an extraordinary character is claimed are: (1) Defending proceedings instituted by stockholders to set aside the bankruptcy pro ceedings; (2) claims of twelve affiliates of the bankrupt; (3) claims of a subsidiary of the bankrupt and certain assignees; (4) claims of B. F. Schlessinger & Sons for rent; (5) claim of Elizabeth Mansur for rent (the last two disposed by the writer); and (6) claim of Fidelity & Deposit Company of Maryland.

Counsel claim to have devoted 614 days since November 30, 1933, in the performance of legal services, of which 344 were devoted to what they consider services of an extraordinary character.

The adjudication of the Owl Drug Company as a bankrupt, upon a voluntary petition, was made on October 10, 1932. On November 22, 1932, George K. Edler was appointed trustee, qualifying on November 28, 1932. He operated certain properties for about ten months. He then sold the assets, and the property in the hands of the trustee consists of money which has come into his hands chiefly through this sale. The sale brought $1,550,000. Altogether the trustee will disburse $1,619,448.66. The expenses of administration (including operation) to date, amount to $283,151.39. This does not include the referee's fee, the trustee's fee, or the fees of the attorney for the bankrupt or the additional fees for the trustee's attorneys. The number of

claims filed and finally allowed was 1,495, of which 113 were contested. The total amount for which the claims were allowed was $3,373,675.94. The controverted claims amounted to $8,731,440.64. They were reduced to $1,995,687.03. Most of the claims were disposed of without litigation by the trustee or by compromises approved by the writer, or before the referee.

In six claims reviews were had before the court and heard by the writer.

These claims, arising under leases, were filed before the decision in Manhattan Properties v. Irving Trust Co. (1934) 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed. 824, for large sums. After that decision, the controversy was reduced to comparatively small amounts. So, ultimately, the Altill Company claim involved $12,500, disallowed by the court; the B. F. Schlessinger & Sons claim $16,658.66, disallowed by the court; the Phelan Improvement Company claim, finally allowed for $1,315.39; the Douglas Realty Company claim, allowed for $1,315.39; the Swetland Building Company claim, allowed for $620.90. Of these, two only—the Schlessinger and Mansur claims—resulted in appeals. Full details on the claims, except the Mansur claim, in which an oral opinion only was rendered, may be found in the writer's opinions on them. See, In re Owl Drug Co. (D.C.Nev. 1935) 12 F.Supp. 431; Id. (D.C.) 12 F. Supp. 439; Id. (D.C.) 12 F.Supp. 446; Id. (D.C.) 12 F.Supp. 447.

■ Fees for the trustee's attorneys are allowable as an expense of administration under section 62 of the Bankruptcy Act (11 U.S.C.A. § 102). The amount is left to the sound discretion of the District Judge [See Harrison v. Perea (1897) 168 U.S. 311, 18 S.Ct. 129, 42 L.Ed. 478; Page v. Rogers (1909) 211 U.S. 575, 29 S.Ct. 159, 53 L.Ed. 332; McCartney, Foster & McGee v. Moore (C.C.A.5, 1926) 16 F.(2d) 113; Weil v. Neary (C.C.A.2, 1927) 22 F.(2d) 893; In re Barceloux (C.C.A.9, 1935) 74 F.(2d) 288, 289]. But this power "is not discretionary in the sense that the courts are at liberty to give *anything more* than a fair and reasonable compensation." Brewer, C. J. in Central Trust Co. v. Wabash, St. L. & P. Ry. Co. (C.C.Mo.1887) 32 F. 187, 188. And because extravagant costs of bankruptcy administration have been recognized as a "crying evil" (Realty Associates Securities Corporation v. O'Connor [1935] 295 U.S. 295, 299, 55 S.Ct. 663, 79 L.Ed. 1446), judges have been warned

by the Supreme Court against vicarious generosity in these matters. In re Gilbert (1928) 276 U.S. 294, 296, 48 S.Ct. 309, 72 L.Ed. 580.

■ So, the test of reasonableness and the aim of economy of administration are always borne in mind in determining the amount. And in applying them certain criteria are followed which are a modification of the usual ones adopted by court decisions and by the ethics of the profession in determining the value of all legal services. They are: The time spent, the intricacy of the problems involved, the size of the estate, the opposition met, the results achieved—all subject to the economical spirit of the Bankruptcy Act. See In re Barceloux, supra; In re Osofsky (D.C. N.Y.1931) 50 F.(2d) 925; In re Lane Lumber Co. (D.C.Idaho, 1913) 206 F. 780; In re Curtis (C.C.A.7, 1900) 100 F. 784; In re National Accessories (D.C.Neb.1936) 13 F.Supp. 278; 2 Collier on Bankruptcy (13th Ed.) pages 1353, et seq.; Gilbert's Collier on Bankruptcy (3rd Ed.) § 1223; 6 Remington on Bankruptcy (3rd Ed.) § 2676 et seq.

■ The instances in which fees over and above the customary fees are allowed in bankruptcy are those "where it is shown to the satisfaction of the court that the services rendered have been unusual and extraordinary, where the bankrupt estate has been materially increased through the diligent efforts of attorneys in discovering assets, or where the duties of the attorneys have been onerous and burdensome with litigation incident to the winding up of the bankrupt estate." In re W. B. Terrell Company (D.C.S.C.1917) 250 F. 317.

In determining the fee in the instant case, I do not think the order of Judge Neterer should be taken as determining *definitely* the additional amount that *should be* received for services of an ordinary character. Rather is it to be interpreted as seeking to establish the *ordinary* maximum which, in his opinion, the estate *should* and *could* bear as a fee for the trustee's attorneys. An examination of the record shows that all the matters which are deemed of an extraordinary character were already pending when the order was made, the last of them, the petition to set aside the adjudication, having been instituted on March 7, 1934.

It is to be borne in mind that while, as a result of negotiations, the claims were reduced approximately 75 per cent., the

result did not mean the bringing of any new property or money into the estate. *The assets of the estate remained the same at all times.* The trustee's attorneys are, no doubt, sincere in their belief that the negotiations over the complex claims of the affiliates and a subsidiary of the bankrupt should be compensated as services of an extraordinary character. We believe, however, that Judge Neterer, *knowing the character of the estate and of the legal work which it required,* took them into consideration in making the allowance and in imposing the limitation.

The transcript of proceedings shows that not only did both Judge Neterer and counsel have in mind the difficulties involved in the matters already pending, but that they agreed that the services which would warrant a greater allowance than the maximum would be what Mr. Woodburn called "ultra extraordinary." Judge Neterer interpreted these words as meaning that not more than the $25,000 additional should be allowed, "unless there is some *very extraordinary* service that *could not now* be anticipated."

We quote the colloquy between court and counsel:

"The Court: What additional compensation would you likely expect?

"Mr. Woodburn: The attorneys have agreed that except *for some ultra extraordinary services,* such as being compelled to go to the Supreme Court of the United States, that the ultimate compensation of all attorneys, the three sets of attorneys in the case, shall be not more than an additional $25,000.00. We have a great deal of work yet to perform. There is pending I think around ninety-six objections; some of them are a matter of great amount. *There is an objection to a two million dollar claim, which it is expected will involve an immense amount of work.*

"The Court: What have you to say to that, Mr. Wilson. That, of course, would be a matter to be determined by the Court, what additional fees should be allowed.

"Mr. Wilson: (Attorney for certain creditors and large claimants.) Yes. I accept counsel's statement that the fee is very reasonable. *I appreciate the fact that there will be a great deal of work to be encountered with respect to the presentation of claims and the resistance of certain claims, including my own that they are*

*quarreling with me about.* I haven't any particular quarrel with them on that.

"The Court: So it is agreed that these services for which attorneys' fees are requested are up to and including November 30, 1933? You understand that?

"Mr. Wilson: Yes.

"The Court: And that *any additional compensation shall not exceed, for all of the attorneys that appear on behalf of the trustee, $25,000.00, unless there is some very extraordinary service that could not now be anticipated.*

"Mr. Shuey: I just want to make this statement: after interviewing many of the attorneys representing creditors I have told them that is the amount we have determined on unless unforeseen litigation develops. We have at the present time about a million and a half of claims still in dispute, or some of those are disposed of, probably, by the decision of the Supreme Court of the United States rendered a couple of weeks ago. In addition to that we have filed written objections to all of the affiliated companies, that is affiliated drug companies of the Owl, and there may be a great deal of litigation on that account. The same is involved as to the preferred stockholders; it may be that the trustee will have to intervene in that litigation some way.

"The Court: Do you want to examine the trustee?

"Mr. Woodburn: I understand that Your Honor is satisfied with the reasonableness of his fee.

"The Court: Well, if all the creditors agree.

"Mr. Woodburn: That is what I understand." (Italics added.)

As a rule, when we speak of "ordinary" and "extraordinary" services of attorneys in matters where the fee is based upon a percentage, such as fees of executors and administrators and their attorneys (see, Nevada Compiled Laws 1929, §§ 9783, 9869), we refer to as ordinary services those relating to ordinary advice and consultation, and to all litigation as involving extraordinary services. See, In re Hegarty's Estate (1924) 47 Nev. 369, 222 P. 793; In re Hansen's Estate (1926) 50 Nev. 16, 248 P. 891.

It is evident, however, that this was not the meaning which the judge and counsel gave to the words inserted in the order.

Judge Neterer has had a long and distinguished career as a District Judge. Generously, he is still placing his valuable experience at the disposal of litigants in his own district and elsewhere, despite retirement. His experience and skill in bankruptcy matters are attested to by his many opinions on the subject which have found their way into the official reports, such as, In re Secord (D.C.Wash.1923) 296 F. 231, 1 A.B.R.(N.S.) 535, to which we shall have occasion to refer in the course of this opinion.

It is not customary, when a portion of an attorney's fee is paid during the process of administration to determine a maximum. When that is done, there must be a purpose. This is especially true when the partial allowance is the large sum of $50,000. This amount is not usually allowed to the trustee's attorneys, for ordinary legal services, even in large estates.

In some California districts, it is customary to allow the attorneys for the trustee, for ordinary legal services, an amount not exceeding double the statutory fee of the trustee.

The very size of this allowance prompted, no doubt, the limitation upon the ultimate fee to be allowed in the estate, at the close of the proceedings. By his action in the matter, Judge Neterer sought to bind the attorneys to a maximum.

A consideration, therefore, of the legal principles which govern the determination of fees in bankruptcy matters, and of their practical application, and of the order of Judge Neterer, in the light of the nature and character of the estate, leads to the conclusion that, in determining the amount of the additional fee, we *should not* divide the services into ordinary and· extraordinary and seek to evaluate each kind. Rather should we consider all the services in the estate together and determine, in the light of these considerations, the amount which, under the circumstances, it is reasonable to allow as a fee to the trustee's attorneys for the work in the entire case, treating the previous allowance as a payment on account.

So doing, the order of Judge Neterer should be taken as indicating a desire upon his part that this fee do not exceed, under ordinary circumstances, the maximum of $75,000.

"The workman is worthy of his meat." Matthew X:10. Skilled attorneys are entitled to the fair value of their services.

■ We must, nevertheless, bear in mind the fact that, in view of the policy of economy of the Bankruptcy Act, allowances for such fees *cannot* and *should not* approximate what attorneys *might* or *would* receive, under similar circumstances, for services to private persons. See, In re National Department Stores (D.C.Del.1935) 11 F.Supp. 633, 638.

As said by Judge Brewer in Central Trust Co. v. Wabash, St. L. & P. Ry. Co., supra, in awarding fees, "we *may not* exercise the generosity of owners, but are closely limited to the justice of judges." (Italics added.)

We subscribe to the apposite words of the court in Re Curtis, supra, 100 F. 784, at page 795: "We are not unmindful of the dignity of the profession, nor forgetful of the important duty of counsel. We would not underrate that duty. We would magnify his office. For exacting labor done, weighty responsibilities assumed, and great results accomplished, we would deal out compensation with liberal hand. We think, however, that the dignity and honor of the profession are not conserved, or its influence for good promoted, by excessive allowance for service."

■■ The approval of the fee asked by all the creditors, with the exception of creditors representing a small percentage of the claims, is entitled to serious consideration. But *it is not* conclusive. The responsibility is ultimately that of the judge. So, considering the other costs of administration, and the desire to limit the maximum fee, which, as stated at this hearing, was the result of an agreement with the creditors' committee and the major creditors, entered into prior to the submission of the matter to Judge Neterer, and the fact, fully apparent from that and from the discussion before Judge Neterer and before me, that while the exact amount of time to be devoted to the matters for which fees are asked *was unknown,* their complicated nature *was known* and taken into consideration in determining the maximum, a total fee of $90,000 for the trustee's attorneys (and those who assisted them) is adequate, and all that an estate of this size should bear, *even if we take into full account the expert nature of the*

*services and the results accomplished.* The additional fee of the trustee's attorneys will, therefore, be fixed at $35,000.

## (2) *Fees for the Bankrupt's Attorney.*

The attorney for the bankrupt asks for the allowance of a fee of $15,000 for services rendered to the bankrupt during the proceeding and of $368.08 as expenses incurred by him.

The legal work for which the fee is asked consists of: (1) The preparation and filing of the petition and schedules, attendance at the creditors' meeting and conferences relating thereto, attendance upon the examination of the debtor, and presence, with him, at meetings subsequent to the first; (2) work in conjunction with securing the dismissal of two involuntary petitions, one filed in the Northern District of California and one filed in this District, as well as work in conjunction with the motion made to transfer the present proceeding to the United States District Court for the Northern District of California; (3) work done in resisting three motions to vacate and set aside the adjudication. (Mercantile Arcade Realty Co.; McDonough and Bru).

The authority for the allowance of fees for the bankrupt's attorney is found in section 64b of the Bankruptcy Act, as amended (11 U.S.C.A. § 104(b) which (among other things) provides: "(b) The debts to have priority, except as herein provided, and to be paid in full out of bankrupt estates, and the order of payment shall be * * * (3) the cost of administration, * * * and one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors in involuntary cases, to the bankrupt in involuntary cases while performing the duties herein prescribed, and to the bankrupt in *voluntary* cases, *as the court may allow.*" (Italics added.) In the application of this provision, since its enactment, certain definite criteria have been evolved for determining the work for which the allowance should be made and its basis. Because some of the work for which fees are asked involves services in conjunction with certain involuntary proceedings and the present proceeding is a voluntary one, we shall, for the sake of clarity, state the principles relating to allowances in involuntary and voluntary cases separately.

The only services for which fees may be allowed in involuntary cases "are those rendered in aid of the administration of the estate and the carrying out of the provisions of the act." Conrad, Rubin & Lesser v. Pender (1933) 289 U.S. 472, at page 476, 53 S.Ct. 703, 704, 77 L.Ed. 1327. Only those services are considered as being in aid of the administration of the estate which result in the benefit of it. Randolph v. Scruggs (1903) 190 U.S. 533, 23 S.Ct. 710, 47 L.Ed. 1165; In re Evenod Perfumer, Inc. (D.C.N.Y.1933) 4 F.Supp. 916; In re Evenod Perfumer (C.C.A.2, 1933) 67 F.(2d) 878; In re Rothman et al. (D. C.N.Y.1936) 14 F.Supp. 241; In re Rothman et al., Glazer et al. v. Joliffe (C.C.A. 2, 1936), 85 F.(2d) 51.

Prior to its amendment in 1926, this section specified that in involuntary cases, the allowance of attorney's fees to the bankrupt was to be for services rendered "while performing the duties" prescribed in the act. Bankr.Act, § 62b (3), 11 U.S. C.A. § 104(b) (3). It was then held that the duties referred to were those imposed upon the bankrupt by section 7 of the act (11 U.S.C.A. § 25). See In re Lane Lumber Co. (D.C.Idaho, 1913) 206 F. 780, 783; Whitla & Nelson v. Boyd (C.C.A.9, 1914) 213 F. 587.

The principle that fees for services in aid of the administration of the estate should be upon the basis of benefit to it, forbids allowance of fees for services rendered to the bankrupt prior to the institution of bankruptcy proceedings, whether they related to litigation pertaining to the bankrupt's affairs or actually involved negotiations with creditors for the settlement of their claims without resort to bankruptcy (Magee v. Fox [C.C.A.2, 1916] 229 F. 395; Conrad, Rubin & Lesser v. Pender, supra; In re Munford [D.C.N.C.1919] 255 F. 108; In re Taylor [D.C.Wyo.1922] 280 F. 127; In re National Accessories [D.C.Neb.1936] 13 F.Supp. 278, 281); or for resisting adjudication (Randolph v. Scruggs, supra; Pratt v. Bothe [C.C.A.6, 1904] 130 F. 670; In re Evenod Perfumer, Inc., supra; In re Rothman, supra); or for defending the bankrupt against charges of fraud or concealment of assets, whether the charges grow out of examination under the Bankruptcy Act or not (In re Mayer [D.C.Wis.1900] 101 F. 695); or in effecting a composition (In re Fogarty [C. C.A.7, 1911] 187 F. 773); or in securing

a discharge (In re Secord [D.C.Wash.1923] 296 F. 231, 1 A.B.R.[N.S.] 535; In re Rothman, supra). On the whole subject, see 2 Collier on Bankruptcy (13th Ed.) § 1229; 6 Remington on Bankruptcy (3d Ed.) §§ 2711–2723.

■ In voluntary cases, the authorities, while sanctioning fees for preparing the petition and the schedules, for securing the adjudication, and for attending the creditors' meeting and the examination of the bankrupt, refuse compensation (unless, through the efforts of the bankrupt's attorney, assets are brought into the estate) for *any other* services except such as were rendered *before* a trustee was appointed and which are beneficial to the estate. See 6 Remington on Bankruptcy (3d Ed.) §§ 2726–2733; In re Terrill (D.C.Vt.1900) 103 F. 781; In re Christianson (D.C.N.Y.1910) 175 F. 867; In re Kross (D.C.N.Y.1899) 96 F. 816; In re Secord (D.C.Wash.1923) 296 F. 231, 1 A.B.R.(N.S.) 535; In re Munoz (D.C.Porto Rico, 1923) 1 A.B.R. (N.S.) 155; In re Duran Mercantile Co. (D.C.N.M.1912) 199 F. 961.

The case upon which counsel for the bankrupt relies, In re Paramount-Publix Corporation (D.C.N.Y.1934) 10 F.Supp. 504, does not go counter to these decisions.

There, an equity receivership had preceded the voluntary petition. The corporation's attorneys had assisted in resisting attacks upon the receivership. Later, when the receivership was changed into voluntary bankruptcy, the court included in its allowance as fees for the bankrupt's attorney a fee for their assistance in resisting the attack upon the receivership, saying: "It was quite proper for them [the bankrupt's attorneys] to help resist attacks on the status of their client in equity receivership, and in so doing they have contributed to the maintenance of a situation which I am thoroughly persuaded has been of great advantage to the estate. * * * In all these matters the bankrupt's attorneys have played a useful part in the maintenance of the situation and are entitled to remuneration." In re Paramount-Publix Corporation, supra, 10 F.Supp. 504, at page 511.

The ruling in this case can be sustained upon the general principle that all expenses of a receivership preceding a bankruptcy are properly allowable out of the subsequent bankruptcy. See, Gilbert's Collier on Bankruptcy (3rd Ed.) §§ 1224–1225, Goodman v. Street (C.C.A.9, 1933) 65 F. (2d) 686.

More, even in strict bankruptcy, services rendered *before* the appointment of a trustee, and which benefit the estate, may be compensated out of the bankrupt estate. (See cases infra.) So, the ruling in the case just cited is right on principle. And the attorney for the bankrupt can derive no comfort from some of the general language used in the opinion arguendo.

Another consideration should be borne in mind. There are no limitations upon the fees allowable in equity receiverships, except the self-imposed restraints originating in the conscience of the judges. Attorneys' fees and other expenses of administration in equity receiverships have been notoriously high. So high, indeed, that the Supreme Court has taken judicial notice of the fact and has attributed the enactment of section 77B of the Bankruptcy Act (11 U.S.C.A. § 207) to the desire of the Congress to replace equity receiverships by a more economical method of administration. Callaghan v. Reconstruction Finance Corporation (1936) 297 U.S. 464, 56 S.Ct. 519, 80 L.Ed. 804.

When we come, however, to fees allowable in bankruptcy subsequent to adjudication, we find strict limitations established by the courts, both as to the services and the amounts. They are the result of the efforts of courts to give expression to, and carry into effect, the economical spirit of the Bankruptcy Act.

The cases already cited declare the services for which *no* allowance may be made.

The allowance is limited strictly to the few acts required to be done by the attorney for the bankrupt *before* a trustee is appointed. *After* that, the bankrupt's attorney *may not* receive compensation, unless he has performed services which have resulted in bringing assets or property into the estate. Gilbert's Collier on Bankruptcy, (3rd Ed.) § 1231; In re Cheney (D.C.Mass. 1924) 300 F. 465.

■ In determining the amount of the fee, courts, aware of the evil of excessive fees, have insisted that in determining reasonableness, the need for economy in administration be borne in mind at all times. This being one of the objects of the Bankruptcy Act. In re Curtis, supra; In re Barceloux, supra; Callaghan v. Re-

construction Finance Corporation (1936) 297 U.S. 464, 56 S.Ct. 519, 80 L.Ed. 804; In re Rothman, supra.

The bankrupt has an inherent right to counsel, for, by the adjudication, he is stripped of his estate. In re Wood & Henderson (1908) 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046; In re Evenod Perfumer, Inc., supra. Nevertheless, courts frown upon the idea of burdening the estate with the expense of furnishing the bankrupt an attorney every time he appears before the bankruptcy court. Whitla & Nelson v. Boyd, supra. Nor is the size of the estate taken into consideration in determining the amount of the fee. In re Lane Lumber Co., supra.

We consider the services for which the bankrupt's attorney asks for fees in the present case.

Under the authorities, no allowance can be made for the services rendered in opposing adjudication in the two involuntary petitions, filed, one in California and one in this court, subsequent to the adjudication. See Randolph v. Scruggs, and other cases, supra. Nor is such allowance warranted by the letter or the spirit of the Bankruptcy Act. The estate should not be penalized for the efforts made by the bankrupt to resist adjudication and thus deprive the creditors of their right to apply his entire estate to the liquidation of their debts. See cases supra.

The fact, adverted to at the hearing, that in the cases in which the question has arisen, the proceedings were in the same estate and in the same court which subsequently administered the estate, and that here the petitions for involuntary adjudication were independent proceedings, one of them filed in another District, in another state, and that in resisting them, the bankrupt's attorney aimed to retain the jurisdiction of this court, does not alter the situation. If the interests of the estate which this court, through its bankruptcy powers, had begun to administer, and over which it acquired exclusive jurisdiction, were involved in these proceedings, the court could have authorized their protection. It did not so authorize. And rightly. For none was necessary, as the adjudication in the voluntary petition gave the court exclusive jurisdiction. It took precedence over the involuntary petitions, so long as they had not proceeded to adjudication. In re Lach-

enmaier (C.C.A.7, 1913) 203 F. 32; In re R. H. Pennington & Co. (D.C.Ky.1915) 228 F. 388.

Nor is there legal authority for making any allowance for services rendered by the bankrupt's attorney in helping the attorneys for the trustee resist the petitions to set aside the adjudication.

When a voluntary petition is filed, the bankrupt strips himself of his property and places it in the hands of the court for distribution among his creditors. Up to the time a trustee is appointed, and where *there is no* receiver in equity or bankruptcy, the bankrupt's attorney is the only person who can safeguard legally the interests of the estate. After the appointment of the trustee and his selection of an attorney (or where there is a receiver), *there is no duty* imposed upon the bankrupt or his counsel *to do aught* to assist in any legal controversy relating to the estate. By the act of adjudication the title to the property passes into the hands of the trustee for the benefit of the creditors. This title dates back to the date of adjudication. Bankruptcy Act, § 70, as amended, 11 U.S. C.A. § 110. His is the duty to reduce to his possession the property of the estate, to manage it, under the direction of the court, and to account for it. Bankruptcy Act, § 47, as amended, 11 U.S.C.A. § 75.

After the adjudication, the duties of the bankrupt are (in substance): (1) To attend the first meeting of creditors and the hearing upon his application for discharge; (2) to comply with all the lawful orders of the court; (3) to examine the correctness of all proofs of claims; (4) to execute and deliver such papers as shall be ordered by the court; (5) to execute transfers of his property in foreign countries; (6) to inform the trustee of any attempt by his creditors or other persons to evade the provisions of the act; (7) to inform the trustee of any false claim against the estate; (8) to file a schedule of his property; (9) to submit to an examination concerning his business, the cause of his bankruptcy and his dealings, when present at the first meeting of creditors or at such other times as the court shall order. Bankruptcy Act, § 7, 11 U.S.C.A. § 25.

*And these are his only duties.* He cannot be required legally to do anything else.

It is *not* his duty, or the duty of his attorney, to assist the trustee, except in the

matters just stated. If he does so, and renders assistance in legal matters handled by the trustee and his attorneys, and for which *they* are entitled to compensation, he cannot look to the estate for compensation.

In re Lane Lumber Co., supra, District Judge Frank S. Dietrich declined to allow a fee for assistance which the bankrupt's attorney had rendered to the trustee in opposing the allowance of a claim of the bankrupt's receiver. Judge Dietrich said: "However commendable the motive which prompted the bankrupt to participate in this contest, its zeal was misdirected. It was certainly under *no legal obligation* in the premises. It was the trustee's function and his duty, and it was also the right of the creditors, to oppose baseless claims, including any such claim, when put forward by the receiver; the extent of the bankrupt's obligation was to furnish to the trustee such material information as was in its possession. As a matter of fact, the trustee was making opposition to this claim, as were also some of the creditors, and to permit the bankrupt to employ counsel at the expense of the trustee when the trustee was already represented by counsel would be to sanction a wholly unnecessary charge against the estate." In re Lane Lumber Co. (D.C.Idaho, 1913) 206 F. 780, at page 783. (Italics added.) In sustaining this ruling, our Circuit Court of Appeal said in Whitla & Nelson v. Boyd (C.C.A.9, 1914) 213 F. 587, at page 589: "It appears that prior to the adjudication in bankruptcy, which was made August 1, 1911, the property of the bankrupt had been placed in the hands of a receiver appointed by one of the courts of the state of Idaho, and *the question of such receiver's claim against the estate of the bankrupt for his fees and expenses incurred was a matter, as the court below properly held, for the trustee and creditors of the bankrupt.*" (Italics added.)

Similarly, in Re Citron (D.C.Porto Rico 1923) 2 A.B.R.(N.S.) 229, the court rejected an allowance of attorney's fees made by the referee for work claimed to have been done for the benefit of the *trustee and the creditors.* Looking for analogous situations, arising under other provisions of the Bankruptcy Act, we find that it has been held that the attorneys for the petitioning creditors are not entitled to receive compensation from the estate for services or assistance rendered, either to the trustee or to the receiver *after their appointment,* unless specifically employed, by authority of the court, for that purpose. In re Roadarmour (C.C.A.6, 1910) 177 F. 379; Morse & Tyson v. Irving-Pitt Mfg. Co. (C.C.A.8, 1927) 18 F.(2d) 692; In re Floore (C.C.A.5, 1926) 16 F.(2d) 113; 6 Remington on Bankruptcy (3d Ed.) § 2692. And unpleasant though the task of rejecting claims of attorneys for services *actually* rendered in bankruptcy, when either *not* authorized or incurred *in violation* of the General Orders in Bankruptcy or of rules of court, may have been, at times, courts have performed it repeatedly and unhesitatingly. See Weil v. Neary (1929) 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243; In re G. W. Giannini, Inc. (D.C.N.Y.1936) 14 F.Supp. 1005.

One can readily see the wisdom of these rulings. Were the law otherwise, there would be no limit to the burden which might be placed upon an estate if attorneys for the bankrupt or individual creditors could, by doing work which *it is not* their duty to do, by assisting the trustee, without an order of court allowing their special employment, burden the estate with the added cost of performing work which it is *the duty* of others to perform. The bankruptcy court would lose control in the matter of fees. "Volunteers" would be numberless. And it is almost certain that in every estate of *any* size, the courts would be confronted with claims for "voluntary" assistance. Hence the practical wisdom of these rulings, sanctioned by our own Circuit Court, that the attorney for the bankrupt be not compensated for work which the bankrupt is *not* under legal obligation to do, but *which it is the duty of the receiver, trustee or their attorneys to perform.*

The facts in the instant case show the unwisdom of a departure from these principles. The attorneys for the trustees have already received the sum of $50,000. Upon a petition just heard, they have been allowed an additional fee of $35,000. Other attorneys assisting them have received $5,000. The work performed by the trustee's attorneys in resisting the attempts to set aside the adjudication (work for which the bankrupt's attorney also seeks compensation) required 85 days in the McDonough matter alone. The amounts heretofore al-

lowed by another judge evidence his confidence (which I share) in the ability of counsel for the trustee. There is no evidence that they called for assistance, other than that for which the $5,000 was allowed. Nor is there any reason to believe that had they done so, the court would have approved the employment.

Concede that the bankrupt and its counsel thought that the protection of its interests required appearance in the matter. Concede that the appearance was prompted also by a sincere desire to assist the estate. Nonetheless, the estate should not be made to pay double, by reason of this voluntary assistance, unauthorized and unasked for. Had the adjudication been set aside, the greatest beneficiary would have been the bankrupt. It is true that it sought the adjudication. But had it been set aside, the bankrupt, in effect, would have gained a declaration of solvency. Its property would have been restored to it. The bankrupt estate would have ceased to exist. The creditors did not seek the bankruptcy. They stood to lose by it, and to gain by a restoration of their contractual and other rights outside of bankruptcy.

Other than the work in resisting the two involuntary petitions, the matters in which the attorney for the bankrupt performed other than ordinary services related to the three attacks upon the bankruptcy proceedings.

The first, in order of time, was that of Mercantile Arcade Realty Corporation, one of the company's lessors, filed on November 14, 1932. It attacked the adjudication as a fraud upon the bankruptcy laws. It alleged domination of the bankrupt by affiliated corporations, and charged that the object of the bankruptcy was repudiation by the corporation of cumbersome leaseholds, damages for which were incapable of proof in bankruptcy.

A motion to dismiss was filed by the bankrupt on December 7, 1932, and an answer on December 29, 1932, *long after the trustee had been appointed and had qualified.* It is true that at the time of the filing of the petition, the trustee had not been appointed. But a receiver in bankruptcy was functioning, capable of protecting the interests of the estate [See, Rivoli Drug Co. v. Lynch (C.C.A.9, 1931) 50 F.(2d) 536] or of asking for the court's authority to do so. That there was no urgency is evidenced by the fact that no pleading was filed until the expiration of *three weeks* after the filing of the petition. The trustee had, in the meantime, qualified, and when the matter came up for hearing, on December 29, 1932, he appeared in the matter by his own attorney. The jurisdiction of the court to hear the matter and the character of the adjudication as res adjudicata were the chief grounds of attack upon the petition. After submission, the court, on January 4, 1933, ordered the petition dismissed, without a hearing on the merits.

The McDonough proceeding took the form of a petition for an order to show cause. It was instituted by certain preferred stockholders in March 7, 1934. It charged control of the activities of the bankrupt by certain affiliated corporations and persons connected with their internal management. It attacked the bankruptcy proceeding as sham, a subterfuge to gain control over the assets of the bankrupt, in violation of the rights of the preferred stockholders and others. It sought to set aside the adjudication as a fraud upon the court. No process was directed under it to the bankrupt. It was terminated by the allowance of the trustee's motion to dismiss, which raised all the legal questions involved. The bankrupt's motion to dismiss raised, in substance, the same questions. In addition to this, the bankrupt filed an answer, in which it denied the control over its activities by certain affiliates, and by persons controlling them. The disposition of the matter upon the motion to dismiss, made the trial of these controverted facts and of some of the facts raised in the trustee's answer, unnecessary. See McDonough v. Owl Drug Co. (C.C.A. 9, 1935) 75 F.(2d) 45.

So, it is evident that while this proceeding sought to set aside the adjudication on the ground of fraud, the fraud charged was incidental to the bankruptcy.

But even if it had been of the type which might have resulted in the prosecution of the bankrupt corporation, it could not bind the estate by incurring legal fees in protecting itself from future civil or criminal liability or fraud. In re Kross (D.C.N.Y., 1899) 96 F. 816; In re Mayer (D.C.Wis.1900) 101 F. 695.

The Bru matter was an attack on the bankruptcy proceedings instituted on April 26, 1933, by three stockholders of the bank-

rupt corporation, by a petition to set aside the adjudication. It alleged that the company was, in fact, solvent, and that the bankruptcy proceeding had been instituted for the purpose of defrauding the preferred stockholders and the creditors.

The order setting it for hearing ordered a copy served upon the attorneys for the trustee, as well as the attorney for the bankrupt. It terminated on August 1, 1933, upon a motion to dismiss, granted, evidently without opposition, the court being satisfied from a mere reading of the petition that it did not state a cause of action. The minutes read:

"The matter of the petition of M. E. Bru, et al., to set aside order of adjudication herein and bankrupt's motion to dismiss same now comes on for hearing, and *J. B. Haller, Esq.,* for and on behalf of E. W. Cheney, Esq., *attorney for the petitioners, asks for further continuance of hearing thereon. The Court informs counsel that he has given this petition some consideration since its filing, has taken into consideration the long delay in filing same, and that the same does not state facts sufficient to constitute a cause of action.* It is by the court ordered that bankrupt's motion to dismiss petition of M. E. Bru, et al., to set aside order of adjudication in bankruptcy be, and the same is hereby granted. An exception to this ruling is granted Mr. Cheney. Thereupon the following order is made and entered, to-wit:

"*Order.* (Order dismissing petition of M. E. Bru, et al., to set aside order of adjudication in bankruptcy) \* \* \*" (Italics added.)

From the moment the trustee was appointed his attorneys were in full charge of the legal affairs of the bankrupt estate. It was their duty to protect it against attack in any form. This they did, at all stages. And the fees they have been allowed in this case attest to the fact that the judges who have presided in the case (*including the writer*) are convinced that they protected the estate ably and conscientiously. The work done by the attorneys for the bankrupt in aiding them in these matters was, therefore, not required of them. It was purely voluntary assistance for which, no matter how valuable it may have been, strictly speaking,

there could be no allowance out of the estate.

If we followed this reasoning to its logical conclusion, the only allowance that could be made would have to be limited to the preparation of the schedules, securing adjudication, attendance upon the creditors' meetings and upon the bankrupt's examination. Such a limitation would not, however, be fair under the circumstances. In fact, no one is contending for it. The creditors who have made objection to the amount of the fee concede that a fee up to $7,500 would be reasonable and proper to allow. We take this concession to mean that the creditors and their attorneys are satisfied that the attorneys for the bankrupt have rendered valuable services to the estate. Under the circumstances, we should be *pragmatic,* rather than *dogmatic.* And fix a fee for the bankrupt's attorney which would be fair, bearing in mind the aim at economy of administration and the fact that certain services only can be required of the bankrupt's attorney, and legally compensated out of the estate.

We believe that a fee of $5,000 will compensate the bankrupt's attorney fully. This sum will be allowed, and the sum of $368.06 claimed for expenses, to which no objections have been made.

(3) *Fees of the Referee.*

The referee's account is before the Court for approval.

She claims to be entitled to the sum of $20,009.99, from which is to be deducted the sum of $1,750 received by her at various times from the trustee on account, leaving a balance claimed to be due her of $18,259.99. To this amount she asks that there be added the referee's statutory commission of one per cent on the last dividend, ordered to be paid August 4, 1936.

The items in the account, which have been questioned by the attorney for the trustee and by the court, relate to flat charges for notices; to claims for indemnity, claimed under subdivision 2 of General Order in Bankruptcy XXXV; and to traveling expenses between the city of Reno and Carson City.

This being a special reference, the question of the referee's commission is also before the court.

The claims for notices are as follows:

"Notices:

| | | | |
|---|---|---|---|
| "1932 | | | |
| Oct. 12 | 3400 | Notices of first meeting of creditors at 15¢, | $ 510.00 |
| Nov. 10 | 3400 | Notices 1st meeting of creditors at Carson City, under orders of U. S. District Court, | 510.00 |
| Dec. 24 | 3400 | Notices, Receiver's Report at 15¢, | 510.00 |
| 1933 | | | |
| July 17 | 3400 | Notices, hearing on petition to compromise claims, at 15¢, | 510.00 |
| Oct. 16 | 3400 | Notices, Petition for Discharge, at 15¢ | 510.00 |
| Dec. 29 | 71 | Notices, objections to certain claims, at 15¢, | 10.65 |
| 1934 | | | |
| Jan. 16 | 50 | Notices, vacation of hearing at 15¢, | 7.50 |
| Jan. 16 | 18 | Notices, ruling on claims, at 15¢, | 2.70 |
| Feb. 23 | 1696 | Notices, Trustee's 1st Report, at 15¢, | 254.40 |
| Mar. 6 | 1696 | Notices, Declaration 1st Dividend, at 15¢, | 254.40 |
| May 28 | 300 | Notices, objections to claims, at 15¢, | 45.00 |
| 1935 | | | |
| Sept. 18 | 1696 | Notices, Hearing on Trustee's 2nd Report, at 15¢, | 254.40 |
| Oct. 4 | 1696 | Notices, Declaration 2nd dividend, at 15¢, | 254.40 |
| 1936 | | | |
| July 17 | 1696 | Notices, Hearing Trustee's 3rd Report, at 15¢, | 254.40 |
| July 27 | 1696 | Notices, 3rd and Final Dividend at 15¢, | 254.40 |
| July 27 | 1495 | Notices under Rule 7 (c), Bankruptcy Rules Ninth District Court, at 25¢, | 373.25 |
| July 27 | 1696 | Filing and conserving Claims, at 25¢, | 424.00 |
| Total | 30806 | | $4,939.50" |

The total amount so claimed is $4,939.50, representing 30,806 notices.

The item for indemnity is thus set up in the account:

"Indemnity, (G.O. XXXV, Sec. 2)

| | |
|---|---|
| "Proportion of Stenographer's salary, October 12, 1932, to October 12, 1933, $150.00 per month | $1,800.00 |
| October 12, 1933, to October 12, 1934, $100.00 per mo. | 1,200.00 |
| October 12, 1934, to August 12, 1936 at $75.00 per mo. | 1,650.00 |
| Assistant Stenographer Proportion of Salary: | |
| October 12, 1932, to October 12, 1933 at $50.00 per mo. | 600.00 |
| October 12, 1933, to October 12, 1934, at $25.00 per mo. | 300.00 |
| Janitor, care of court room, | 25.00 |
| Proportion of office rent, October 12, 1932, to August 12, 1936 at $10.00 per mo. | 460.00 |
| Total | $6,035.00" |

The total claim under this item is $6,035.

The amount claimed for traveling expenses represents 35 trips to Carson City at $10 per trip, for which a claim of $350 is made.

The fees of referees in bankruptcy are governed by section 40 of the Bankruptcy Act, as amended (11 U.S.C.A. § 68).

Section 72 of the Bankruptcy Act, as amended (11 U.S.C.A. § 112), provides that: "Neither the referee, receiver, marshal, nor trustee shall in any form or guise receive, nor shall the court allow him, any other or further compensation for his services than that expressly authorized and prescribed in this Act [title]."

The referee, being an officer of the court, ' exercising judicial functions, the provisions of the Bankruptcy Act, fixing his compensation, are strictly construed. Callaghan v. Reconstruction Finance Corporation (1936) 297 U.S. 464, 56 S.Ct. 519, 80 L.Ed. 804.

152

The prohibition against the receipt by the referee of other compensation than that provided in the Bankruptcy Act has been carried over into the General Orders in Bankruptcy, promulgated by the Supreme Court. The Orders, however, allow the referee to exact an indemnity for expenses in publishing or mailing notices, or in traveling, or in procuring the attendance of witnesses, or in perpetuating testimony. General Order 10, as amended in 1933, 11 U.S.C.A. following section 53.

They also provide that the compensation of referees prescribed by the court "shall not include expenses necessarily incurred by them in publishing or mailing notices, in traveling, or in perpetuating testimony, or other expenses necessarily incurred in the performance of their duties under the act and allowed by special order of the judge." General Order 35, 11 U.S. C.A. following section 53.

The rules of court of the District of Nevada provide:

"It shall also be the duty of the referee at the time of closing the estate to mail to each creditor whose claim has been filed and allowed a summarized statement of all moneys received and disbursed in the proceedings, and referees shall be allowed a fee of 25 cents for each notice so sent." Rule 7 (c).

"Referees will be allowed at the rate of 15 cents each for notices to creditors, sent in compliance with law, *to cover expense of stationery, clerk hire, and office rent;* and he shall also be reimbursed for any other actual and necessary expense covered by General Order XXXV, Subdivision 2, provided that for the required mailing of copy of petition for discharge and order to show cause the rate shall be 15 cents for each creditor." (Italics added.) Rule 10 (c).

The object of the Congress in enacting section 72 of the Bankruptcy Act was to put an end to the custom which had grown up of allowing to referees special compensation, other than that provided for in section 40 of the Bankruptcy Act. It was not the intention of the Supreme Court to provide for a method of increasing the compensation of referees, under the guise of expenses, in violation of the letter or spirit of the Bankruptcy Act. On the contrary, in the General Order to which we have referred (General Order 35 (2) ) they repeated the injunction against further compensation.

■ Neither the Supreme Court nor the District Judges have power to grant to referees additional compensation. Dressel v. North State Lumber Co. (D.C.N.C.1902) 119 F. 531; In re Wilcox (D.C.Mich.1907) 156 F. 685; In re Langford, Felts & Myers (D.C.Cal.1915) 225 F. 311.

As said in U. S. v. Ward (C.C.A.8, 1919) 257 F. 372, at page 376: "The District Courts have a general jurisdiction in bankruptcy, but they have no power, when exercising that jurisdiction, to allow a referee, under any form or guise, any other or further compensation for his services as referee than that expressly authorized and prescribed by the bankruptcy law. It cannot transcend the power conferred by law." See, also, Folda v. Zilmer (C.C.A.8, 1926) 14 F.(2d) 843; In re Press Printers & Publishers, Inc. (C.C.A.3, 1926) 12 F.(2d) 660.

■ By the indemnity provision in General Order 10, the Supreme Court merely provided that the referee could require that he be indemnified before incurring certain necessary expenses. This provision does not contemplate the retention of the amount of the indemnity as of right. It contemplates what the word "indemnity" implies; namely, security for repayment of costs actually incurred. Even after they are incurred, the referee is not authorized, as a matter of course, to appropriate to the payment of his expenses funds of the estate in his hands. In re Ehrlich (D.C.Pa. 1924) 3 F.(2d) 62.

■ Nor does General Order 35, allowing certain expenses, necessarily incurred, contemplate the arbitrary charge by the referee of amounts to cover such expenses, irrespective of whether they are incurred or not. On the contrary, they contemplate only reimbursement for expenses actually incurred for the purposes set forth in the Order. In re Pierce (D.C.Colo.1901) 111 F. 516; In re Dixon (D.C.Cal.1902) 114 F. 675, 676; In re Mammouth Pine Lumber Co. (D.C.Ark.1902) 116 F. 731; In re Daniels (D.C.Iowa, 1904) 130 F. 597; In re Hatcher (D.C.Tex.1906) 145 F. 658; Bray v. Johnson (C.C.A.4, 1908) 166 F. 57; In re Loughney (D.C.Wash. 1914) 218 F. 980; In re Capital Security Co. (D.C.Tenn.1918) 251 F. 927; Gilbert's Collier on Bankruptcy (3d Ed.) § 883.

■ In the administration of bankruptcy estates, particularly in large districts, it was found difficult, as a matter of book-

keeping, to keep track of the actual expenditure incurred in each of the acts which the referee is required to do and for the expenses for which he can be reimbursed under the General Orders. So in most districts rules, such as the portions of rules 7 and 10 in the Nevada District already quoted, have been formulated. Some question has arisen as to whether even such a rule could, under all circumstances, be justified. Nevertheless, most of the districts have operated under such a rule, as being the only practical method of providing for reimbursement. And if the amount is reasonable, no fault can be found with it. In re Pierce, supra.

Where such rule exists, *there can be no other allowance,* whether the rule says so specifically or not. The rules of this District say specifically that the flat rate for notices shall be in lieu of all compensation for stationery, clerk hire, and office rent.

 In the light of this, the contention of the referee here, and of her counsel, that in addition to the flat rates provided for in the rules, she is entitled to compensation in the sum of $6,035 for stenographers' hire and office rent, is untenable.

While she lists these expenditures as indemnity under the General Orders, she contends that she is entitled to them as a matter of right. Such an interpretation would do violence to the spirit and letter of the Bankruptcy Act and of the orders of the Supreme Court. It would restore the very evil which the Congress sought to cure by the enactment of section 72 of the Bankruptcy Act, restricting the compensation of the referee to the commissions provided in the act. The Supreme Court, by providing for reimbursement of the referee for certain expenses incurred in doing certain specific acts, did not mean, in violation of the Bankruptcy Act, to increase the compensation of the referee. It meant, as the Order says, to reimburse the referee for actual expenditures. General Order 35 (2), 11 U.S.C.A. following section 53.

To provide against loss, it made it possible for the referee to ask that he be indemnified in advance for such expenditures. And when the District Court of this District provided for a flat fee of 15 cents for sending out certain notices, and one of 25 cents for sending out others, it meant, as the rule specifically says, that allowance to cover not only the actual mailing, *but*

*all clerical expenditures, including the stenographers' expenses and office rent,* that may be necessary in order to perform the work. Unless the rule is given full effect and is made to cover stenographers' fees and office hire and the use of a room to hold hearings, the 15-cent charge in the one instance, and the 25-cent charge in the other instance, for sending out notices could not be justified legally. It would be exorbitant and not a mere return for expenditures. For it is a matter of common knowledge, as testified by the referee here, that all the referee does is to prepare one notice, which he causes to be printed. And the only work involved in sending out notices consists in placing the notice in a franked envelope and in addressing the envelope to the person to whom the notice is sent.

If we evaluate merely the labor involved in the mailing of the notices and exclude from it the items which the rule says it shall cover, the cost of sending the average notice would not amount to more than 1 or 2 cents. The larger charge can be justified on one ground only; namely, the ground of the very rule which, in compliance with the letter and spirit of the Bankruptcy Act and of the General Orders, states that it is meant to cover expenses of stationery, clerk hire, and office rent.

It follows that the sum of $6,035, claimed by the referee as indemnity, over and above the allowance for mailing of notices at the flat rate provided in the District rule, must be disallowed.

 We are also of the view that the flat charge of $10 a day for 35 trips from Reno to Carson City is arbitrary and is not supported in the record by any evidence of its ever having been incurred. The distance between Reno, which is where the office of the referee was located, and Carson City is 31 miles. The transportation between the points has varied. The average has been $2.25 for a round trip. This is the transportation charge the government allows District Judges and other government employees, who travel between the two points.

The referee used her own automobile in her travels. And while her counsel, at the hearing, sought to defend the charge on the ground that she *might have* incurred expenses for meals and hotel, there is no itemized statement of such expenditure in her account, nor is there any testimony in the record at the hearing that

she actually incurred them. In re Elk Valley Coal Mining Co. (D.C.Ky.1914) 213 F. 383.

We feel, therefore, that no more should be allowed than the actual cost of transportation for the 35 trips, at the rate of $2.25 per trip, a total of $78.75.

There will, therefore, be deducted from the account of the referee the sum of $6,035, claimed as indemnity, which is disallowed, and the sum of $271.50, being overcharge for transportation, or a total of $6,306.50.

■ There remains for consideration the amount of the commission to be allowed to the referee. She has asked for the full statutory commission.

Ordinarily, when there is a general and unconditional reference, the fee provided in section 40 of the Bankruptcy Act is mandatory. However, where there is a special reference, subdivision (c) of the section (11 U.S.C.A. § 68 (c) provides that "the judge shall determine what part of the fee and commission shall be paid to the referee."

The reference here was not *general, but special.*

On October 10, 1936, an order of general reference was made. The first meeting of the creditors not resulting in the selection of a trustee, the referee appointed Richard Kirman as trustee. Kirman resigned on November 5, 1932. On November 7, 1932, the bankrupt petitioned the court to revoke the general reference, and substitute therefor a special reference. The petition stated that owing to the magnitude of the estate, many legal problems might arise which called for solution by the District Judge rather than the referee. The District Judge acceded to the request, saying:

"The Court: (Honorable Frank H. Norcross) The Court is impressed that this case is one very much out of the ordinary in so far as bankruptcy proceedings in this court are concerned. It is a case in which very large interests are represented, all located entirely without this district. It was for that reason the Court felt, of its own motion, that in the appointment of a receiver to take charge pending the election of a trustee that some bank or trust company could better perform that function than some individual. The Court would have been entirely satisfied to have had the receiver heretofore appointed, or

Mr. Kirman, to continue as the trustee in the case. However, in view of what has transpired and the importance of this case, and because it is a matter that is liable at any time to involve serious questions of law as well as facts, and that this Court of itself must eventually determine all of those questions, the Court will feel better satisfied if all important hearings hereafter are directed before the Court. I believe the Referee herself will appreciate that course. I think the Referee has proceeded as she felt was for the best interests of the case. The selection of Mr. Kirman the Court believes would give general satisfaction among the creditors themselves.

"It will be the order of the Court that the order heretofore entered on the 10th of October referring the matter of the bankrupt to a referee in bankruptcy be and the same is vacated, subject to the retention of power to issue any notices which may be necessary to creditors or others, for the meeting of creditors before this court. The order to take effect immediately."

The formal order entered on the same day so limited the powers of the referee. As a consequence of this order, many of the matters (including even creditors' meetings) which are ordinarily handled by the referee, were handled or heard by the judge. Many of the administrative matters usually falling upon the shoulders of the referee were done by the clerk of the court and the trustee.

The judge exercised direct supervision over the funds (running into many millions) passing through the hands of the trustee during the operation of the business, and even after the sale.

There is no warrant in the record for the referee's claim that a good deal of the work done by the clerk (and the trustee) was a duplication of hers. The fact is undisputed that much of the work, ordinarily done by a referee, was not done by her. The request of the bankrupt and the nature of the estate prompted the District Judge to make the reference special. That fact, and the fact that, for ten months, the trustee conducted the extensive business of the corporation, dispensed with the need for many of the acts usually performed by the referee, and called for a more direct supervision by the District Judge himself.

Under the circumstances, to allow the referee the commission for a full reference upon the dividends and preferred

claims paid, would be unfair to the estate. The full commission claimed amounts to date to $8,615.38, to which the referee requests that there be added the commission upon the last dividend declared August 4, 1936.

On that date, there was available for the payment of this dividend the sum of $475,-222.62. The fees ordered paid will reduce this amount to about $400,000, which would make the allowance asked by the referee, on account of commissions alone, $12,-615.38.

We believe that this amount is not justified by the facts in the case. More, it is out of proportion with the work done by the referee in this case, and would be unfair to the estate.

Of course, the mere assumption by a District Judge of certain of the duties of the referee would not, *in the absence of a special reference,* permit a reduction in the statutory fee and commission. Before the provision, giving the judge the right to determine, upon revocation of a reference, or when the case is specially referred, the amount of the fee and commission which shall be paid to the referee was added by amendment (in 1903, 32 Stat. 799, c. 487, § 9 [11 U.S.C.A. § 68]), the provision for fees and commissions was considered mandatory in all cases. It was then held that the judge, by assuming many of the duties of the referee, could not reduce his commission. The ground for the ruling was that the commission, being "fixed absolutely by the terms of the Act," the action of the judge in consenting "to act in some matters where the referee might have acted, in no way affects the right of the referee to commissions." In re Barber (D.C.Minn. 1899) 97 F. 547, 549.

As the law stands now, the right to the statutory commission is no longer absolute, except when there is a general reference. The referee cannot, under any circumstances, receive more than the maximum established by section 40 of the Bankruptcy Act. But in case the reference is revoked or there is a special reference, *he may* receive a *part only* of the fee and commission, to be determined by the judge, in his discretion.

As shown, the present case is clearly one where the court should exercise this discretion.

More, by the special reference, the court clearly contemplated a situation which would call not only for the limitation of the powers of the referee, but the subsequent reduction of her commission also.

The order specifically provided: "It is further ordered that the Court reserves the right to determine what part of the fees and commissions allowed to referees under Section 68 of the Bankruptcy Act shall be paid to the referee herein."

In view of the fact that the exact amount of the last dividend ordered paid August 4, 1936, is not known, and to avoid any controversy that might arise as to method of computation, and which might delay further the closing of the estate, rather than fix the amount upon the basis of a percentage of the maximum 1 per cent., we will allow the referee the sum of $5,000, as a total commission on the dividends and preferred claims already paid, and on the final dividend ordered paid on August 4, 1926.

We are satisfied that this amount is adequate and ample compensation, over and above the other fees and expenditures allowed.

The account of the referee will, therefore, be approved in the total sum of $10,-086.86. As she has already received the sum of $1,750, her account is approved for the balance of $8,336.86 and no more.

The trustee is ordered to pay the amounts herein allowed.

Exceptions allowed.