# 812

## In the Matter of SEED MARKETING ASSOCIATION, Inc., Bankrupt.
### No. B-0749.

United States District Court
D. Nebraska.
Jan. 24, 1964.

---

Edmund D. McEachen, Omaha, Neb., for Applicant.

1. Wherever either the word "attorney" or "Trustee's attorney" appears it shall be understood to refer to either the firm of Young, Holm & Miller, or the successor firm, Young, Holm, McEachen, Knowles & Hamann.

2. In passing, the writer of this Memorandum concludes that he should state, that in an informal conference with the

ROBINSON, Chief Judge.

This matter is before us on the petition for review of the Referee in Bankruptcy's determination [see appendix] of the amount to be allowed as fees to the Trustee's attorney.[1] The attorney, applicant herein, has requested remuneration in the amount of $25,731.00 in fees and $309.75 as reimbursement of expenses. The Referee determined that $18,500 was a sufficient sum to adequately compensate the attorney and the request for expenses was allowed in toto. The attorney has filed this petition to review that finding.[2]

We realize that great weight must be given to the decision of the Referee and that his findings should not be overturned lightly. However, after carefully reviewing the record and considering the evidence presented at the hearing in support of the application for allowance of fees and having in mind, particularly in reviewing the matter, that credibility of the witnesses [an important factor when it is put in issue] is not drawn into question, we feel obliged to reverse the findings of the Referee and award the full compensation requested by the applicant. In fairness to all parties concerned, we deem it advisable to elaborate more broadly on the reasons compelling this decision as made today.

Naturally, we gave great weight to the cogent reasoning set forth by the Referee in support of his findings. We recognized the fact that this case was the oldest one in the Bankruptcy Court and that there was, at the time, an apparent lack of drive on the part of the attorney. We also recognized the value of the Referee's thoughts in regard to the percentage of the estate which should be allotted to the attorneys.

Referee at a time prior to the formal hearing on the requested allowance of fees to the attorney, the writer expressed himself as being generally in accord with the views later so ably expressed by the Referee in his Memorandum Opinion [see appendix]. However, after a careful study and review of the record as made, the writer has reached the conclusions herein set forth.

On the other hand, we considered the record of the hearing, the fact that the attorney's request was uncontroverted, this Court's knowledge of and experience with the attorney involved herein, the fact that this was a no-asset estate which blossomed into one of at least somewhat healthy proportions, and the fact that the attorney had what we consider a valid excuse for the delays which were had in closing this case.

We have laid the emphasis on the matters involved in this review in a slightly different manner than did the Referee. We would give somewhat more weight to the fact that this was a no-asset estate at the initiation of this attorney into his position as attorney for the Trustee, thus making the possibility of gaining any remuneration contingent, at best, on the performance rendered to the estate. Considering the experience of this Court with the applicant, we would also give more weight to the fact that he is an attorney of some recognized competence in this locale, thereby justifying by his ability a fee which would properly compensate for this. [Had it not been for this ability, we are not sure that this estate would have had nearly as many assets as it has today].

The delays which were supposedly caused by the applicant have been shown at the hearing to have resulted from his exercise of a value judgment as to the proper time to make certain moves with respect to the increasing of the estate or decreasing the claims against it. We do not believe that an attorney should be penalized for exercising a value judgment which has, in reality, been of aid to the collection of assets for the estate.

We also believe that it is quite important that the claims against the estate were reduced from approximately $450,000 to about $80,000. It is only proper that good results be properly rewarded. Such a reduction in the claims against the estate is, in our eyes, quite an accomplishment, indeed.

It is also our opinion that the evidence does not substantiate the findings made by the Referee. The greater portion of this work was done before the present Referee came into office, and we feel that this Court is in a better position in that regard to adequately appraise the work done and results accomplished. There was no evidence adduced to controvert the claims made by the attorneys, and we agree with the Referee that under those circumstances the creditors who are not present should be protected by the exercise of the experience and knowledge of the Referee in these matters. As we mentioned above, however, considering the facts of this case, we believe that this Court is in a better position to properly evaluate the work done.

As a final thought, we would like to mention the fact that it is important to the creditors, the Trustee, the bankrupt, the Referee, and the public in general, that competent attorneys be attracted to do the work of attorney for the Trustee in Bankruptcy. While the fees which are awarded to these men must be liberally sprinkled with the economical spirit of the Bankruptcy Act and the parallel idea that attorneys can't expect the same type of compensation as might be charged to a private client, the fact still remains that competent attorneys deserve to be compensated in a fashion which would justify their bringing this wealth of experience and knowledge to the Bankruptcy Court. The Courts must recognize that these men must be adequately and fairly compensated if they are to be expected to lend their skill and talent to this area of the law.

In keeping with the thoughts mentioned above, we believe that the attorney, applicant herein, should have been allowed the amount of compensation which he requested. Accordingly,

It is ordered that the Order of the Referee herein reviewed should be and it is hereby modified to the extent that the attorney for the Trustee shall be allowed the sum of $25,731.00 in fees in lieu of the sum of $18,500.00 heretofore allowed by the Referee. In all other re-

spects the Order of the Referee is affirmed.

## APPENDIX

### OPINION OF REFEREE

There is before the Court the Application for Fees and Expenses of Young, Holm, McEachen, Knowles & Hamann, Attorneys for the Trustee. The application is for $25,731.00, fees and for $309.75 expenses. A hearing was held on the Application on December 5, 1963, after due notice by mail to creditors. No creditor appeared to oppose the Application. At the request of Mr. McEachen a court reporter was present. After hearing evidence presented by Mr. McEachen the Court announced that it was going to allow on the Application fees of $18,500 and expenses of $309.75. It being the desire of Mr. McEachen to have the award of fees reviewed, no written order of allowance was entered so that the testimony could be transcribed and filed with the Court. This was accomplished on January 3, 1964, and it is now appropriate that I enter my written Order of allowance of fees on the Application. Also, I think it appropriate to enter an Opinion on my ruling. It is, of course, necessary that I make findings of fact and conclusions of law; and this Opinion will include and shall constitute such findings and conclusions. The facts will be separately stated in numbered paragraphs; the conclusions of law shall be in narrative form. My Order will be entered separately.

### FINDINGS OF FACT

1. On July 18, 1958, the firm of Young, Holm, and Miller was appointed Attorney for the Trustee by order duly entered herein. That firm is no longer in existence; its successor in interest is the firm of Young, Holm, McEachen, Knowles and Hamann. At all times Edmund D. McEachen, partner, has been the individual primarily responsible for discharging the duties of the office of Attorney for the Trustee.

2. The Attorney for the Trustee performed necessary professional services for the Trustee by representing him in the following matters:

(a) *Compromise on Seed in Iowa City.* Bankrupt had been operating a plant for its seed processing and handling business from leased premises in Iowa City, Iowa. Seed which had been delivered to Bankrupt in Iowa City had, before the filing of the Petition herein, come into the possession of the Iowa State Bank and Trust Company. This bank had been appointed Receiver in an action in an Iowa Court, the parties to which were Bankrupt, Douglas Guardian Warehouse Corporation, which had been a field warehouseman for Bankrupt, and fifty-seven creditors of Bankrupt who had delivered the seed to Bankrupt. The deliverers were all claiming a pro rata interest in the seed, which was hopelessly comingled. Douglas Guardian claimed a first right to the seed. The Trustee also claimed first right to the seed. The services of the Attorneys for the Trustee consisted of negotiating two agreements with the parties to the action in the Iowa Court. The first agreement was entered into on or about September 24, 1958, and allowed the Iowa State Bank and Trust Company to sell the seed held by it, the rights of all parties to be transferred to the proceeds. Pursuant to this agreement, the seed was sold on or about December 19, 1958, for $21,832.87. The second agreement was entered into on or about June 8, 1962 and provided that the Trustee would disclaim all right to the $21,832.87 and in addition to a disputed check of $2,986.50 (refund of insurance premium on seed) and that in return all parties to the action in the Iowa Court would satisfy their claims out of the disclaimed property, their claims in this estate being withdrawn. Opposition to the Trustee came from two attorneys representing all fifty-seven deliverers and from two attorneys representing the Iowa State Bank and Douglas Guardian. The Attorney for the Trustee did not negotiate with the fifty-seven deliverers. The beneficial result to the estate from the negotiations was the withdrawal of claims. On their faces, these claims

totaled over $109,000; however, most of their claims were grossly overstated and if these claims had remained in the estate their total would have been reduced to approximately $50,000. (The overstated claims were based on seed delivered to Bankrupt which claimants valued at 25¢ per pound; the value of the seed was, in fact, about 10¢ a pound and similar claims not affected by the compromise were so reduced in this estate without a contested hearing). Considering that over $24,000 was disclaimed for payment of $50,000 in claims, the result of the agreements was fair both to the estate and the opposing parties, and not a substantial victory or defeat for either.

(b) *Litigation and subsequent Compromise of Campbell Seed House and Baska lien.* At the time of the filing of the Petition, Campbell Seed House and Joseph J. Baska claimed a joint lien on Bankrupt's building and equipment in Norfolk, Nebraska, and the Bankrupt's equipment in Iowa City, Iowa. By agreement entered into on or about February 20, 1959, the Trustee sold these assets free and clear of the claimed lien, with the claimed lien being transferred to the proceeds and its validity to be later determined. The Attorney for the Trustee negotiated the agreement whereby the assets could be sold free and clear and assisted the Trustee in finding purchasers who would be acceptable as lessees on the leased premises on which the assets were located, thereby increasing the sale price obtained. The Norfolk assets yielded $45,000 and the Iowa City assets yielded $5,012. The lessor of the Iowa City premises, having obtained a lessee as a result of the sale, withdrew his claim for pre-bankruptcy rent of $150.00 and post bankruptcy rent of $2,700. After the sales, the Attorney for the Trustee represented the Trustee in a summary proceeding to ascertain the validity of the lien on the proceeds. Issues were joined by a joint secured claim filed by Campbell and Baska on August 15, 1958; an objection and counterclaim filed by the Trustee on July 17, 1959; and various amendments. The secured claim as amended alleged a lien securing an indebtedness of $40,859.05 plus interest of 6% from February 1, 1958. The Trustee in response alleged that the lien had been obtained within four months of bankruptcy and was void as a preference under Section 60. Referee Murphy heard evidence on September 14th and 28th, 1959. Subsequently, on March 28, 1960, he entered his Order, holding that the lien claimed was void as a preference, that the claim should be disallowed as a secured claim, and that the claim should be allowed as a general unsecured claim in the amount of $41,709.38. In addition, he allowed claimants reimbursement of $820.30 which they had expended for insurance premiums to protect the assets. A Petition for Review was taken and the Chief Judge affirmed Referee Murphy without further evidence and without argument. A notice of appeal was filed by Campbell and Baska, but immediately thereafter the appeal was dismissed pursuant to a compromise agreement. The terms of that agreement in general were that the Trustee should pay $7,120.23 to Campbell and Baska and that the claim of Campbell and Baska should be disallowed both as a secured and unsecured claim. Opposition to the Trustee throughout the litigation and compromise by counsel for Campbell Seed and Baska was of the strongest kind. The beneficial results of the compromise were that $39,666.51 was received by the Trustee free of all liens (had the liens been sustained with interest to the date of Referee Murphy's Order, the Campbell Seed and Baska would have been entitled to receive, including $820.30 for insurance to protect the security, approximately $46,786.74 rather than the $7,120.23 received) and that the claim of Campbell Seed and Baska, which was unquestionably valid as an unsecured claim of $40,859.05, was dismissed. Considering all the circumstances, the result of the litigation was a substantial victory for the Trustee.

(c) *Litigation and subsequent compromise in Ramy Seed Company v. Douglas*

## 816

*Guardian Warehouse Corporation.* At the time of the filing of the Petition herein, there was pending in the United States District Court for the District of Nebraska an action instituted by Ramy Seed Company against Douglas Guardian Warehouse Corporation, which had been doing field warehousing for Bankrupt, and against numerous other defendants. The Trustee, represented by his Attorneys, intervened. A Receiver had been appointed to hold assets in dispute. Numerous complicated legal and factual issues were presented. Twenty-two parties appeared. There were 291 separate filings. Depositions totaling 1,354 pages were taken by various parties. Eventually, after a hearing of one day's length before a master and prior to decision the matters involved were compromised. The Trustee received $20,000, and withdrawal from this estate of a claim by the National Bank of Norfolk of $75,407.06 and of a claim of Troutman and Chilcoat of $7,686.00—these claimants being among the parties to the action. Opposition to the Trustee by counsel for other parties was vigorous. The result must be considered a victory by the Trustee.

(d) *Compromise of Claim against the National Bank of Norfolk.* The Attorneys for the Trustee instituted an action in the State Courts against the National Bank of Norfolk to recover security held by the Bank to secure indebtedness owed by Gene T. Bomar, General Manager of Bankrupt. It was the claim of the Trustee that the security held belonged to Bankrupt and could not be used to secure a personal debt of Bomar. This action was dismissed as part of the Ramy Seed Compromise. Also, as part of that compromise, the Bank relinquished a claimed lien on $4,320 by the Trustee. By agreement assets had been sold free and clear of liens claimed by the Bank, the liens to attach to the proceeds. The $4,320 was the proceeds. Opposition to the Trustee was strong; the result was a victory for the Trustee.

(e) *Small Business Administration Litigation and Compromise.* The S. B.

A. filed a claim in these proceedings in the amount of $48,501.34. It was alleged that the claim was entitled to priority. On October 12, 1962, the Trustee filed an objection to this claim. In general, the Trustee's theory was that the Small Business Administration, which had been a party to the Ramy Seed Company litigation, had wrongfully released security as part of a settlement entered into in that litigation and had no claim for any amount against the bankruptcy estate, and that even if it did have a claim, it had to prove the value of the security which it released. Further, the Trustee claimed that said claim of the Small Business Administration was in part for attorneys' fees and interest which were not allowable in bankruptcy court. After numerous continuances, a pretrial conference, and a hearing of somewhat more than one-half day in length, a compromise was entered into where the claim of the Small Business Administration was allowed as a priority claim in the sum of $12,818.41 and disallowed as to all other amounts. Opposition to the Trustee was in part strong. The beneficial result was that there was available for unsecured creditors and expenses the amount of $20,205.51 by reason of this action; there was no additional money brought into the estate by reason thereby. The Compromise represented a split almost down the middle. Although the claim was for $48,501.34, much of this amount was for counsel fees and interest which, after deliberating, the U. S. Attorney was not willing to strongly contest. In effect what was done was to reduce the claim by the amount of attorneys fees and interest, and then split the balance, the S. B. A. receiving slightly over half of that difference. The compromise was one which was not a victory or defeat for either the Trustee or S. B. A.

(f) *Default of Gene T. Bomar.* Gene T. Bomar was an officer of the Bankrupt at the time of the filing of this Petition. He had in his possession assets which the Trustee sold for $4,000.00. He also asserted a claim in the bankruptcy estate

of $27,000.00. The claims of Mr. Bomar in this estate and the claims which he had against the assets were dismissed as a consequence of a default hearing.

(g) *Routine Matters*. The Attorney for the Trustee represented the Trustee in miscellaneous routine matters. Two claims filed as wage priority claims were objected to for the reason that the claims were for over $600 and only $600 may be allowed as wages entitled to priority. After default hearing, the first was allowed as a priority claim in the amount of $363.75 and as a general unsecured claim in the amount of $500.00. The second was allowed as a priority claim in the amount of $600.00 and as a general unsecured claim in the amount of $139.-08. Also, the Attorneys for the Trustee filed objections to unsecured claims in this estate, basing those objections on the excessive amount of the claims. On these objections, there were three hearings. The first of these was on May 24, 1962, and as a result thereof claims on file herein were reduced a total amount of $6,475.53. Another hearing was held on June 18, 1962, and as a result of this hearing claims were reduced in the amount of $28,434.04. A third hearing was held on September 11, 1963, and as a result of this hearing claims were reduced in the amount of $12,468.39. In all the hearings, there was but one contest, this taking one-half hour to hear. In addition to these hearings claims filed late were expunged by the Referee on his own motion at the suggestion of the Attorneys for the Trustee. These totaled $17,434.79. Also, the Trustee exchanged some assets of the Bankrupt in return for the withdrawal of a claim in the amount of $4,844.15.

3. Substantially all of the funds in the hands of the Trustee on the date of the hearing stem from the Campbell Seed and Baska compromise, supra, the Ramy Seed compromise, supra, the National Bank of Norfolk compromise, supra, and the Gene Bomar default, supra. The Trustee sold assets for approximately $1,000 without assistance of the Attorneys for the Trustee. Shrink-age in the estate due to normal expenses of administration has consumed any assets recovered and sold by the Trustee without assistance. Shrinkage in the estate due to expenses of litigation, and perhaps due to a few other related causes, has also reduced the amounts recovered from the compromises and default. After payment of all expenses other than the commissions of the Trustee, the fees for the Attorneys for the petitioning creditors, the fees for the Attorneys for the Bankrupt, and the fees for the Attorneys for the Trustee, there is remaining in this estate the sum of $64,-204.79. By separate Order not contested the Trustee has been allowed commissions of $1,186.07, the attorneys for the petitioning creditors have been allowed a fee of $750.00 and the Attorneys for the Bankrupt have been allowed a fee of $600.00. After payment of these commissions, and fees there will be remaining in the estate $61,568.72.

4. The total claims filed and allowed and to be paid from said $64,204.79 are the following: Priority, $16,862.61; Secured, none; Unsecured, $63,146.04.

5. The Attorney for the Trustee has spent a total of 1036½ hours in working on matters in this estate, of which total amount 1005⅚ hours were spent by Mr. McEachen and 30⅔ hours were spent by others in the firm. As will appear in detail from findings below, not all of the total of 1036½ hours spent is a reasonable and necessary expense to this bankruptcy estate.

6. Included in the total of 1036½ hours spent by the Attorney for the Trustee, is an amount of time not clearly ascertainable spent in the preparation of the fifty-one page Application for Fees. The amount of time spent in preparation of the fifty-one page Application is not a reasonable and necessary expense to this bankruptcy estate.

7. This estate has been pending for five and one-half years; it is the oldest case on the Referee's docket. If administered with ordinary diligence, this estate should have been closed approxi-

mately two years to two and one-half years ago. The cause of its being held open for the last two years to two and one-half years, and the sole cause, has been procrastination by the Attorney for the Trustee. In order to move the estate forward, at all times since the middle of 1961, it has been necessary for Referee Murphy before me, and for myself, to repeatedly request the Attorney for the Trustee to take some action. It was eventually necessary for me to inform the Attorney for the Trustee that the Referee would require the Trustee to obtain new counsel if action were not forthcoming from the Attorney for the Trustee. There is no justification for the conduct of the Attorney for the Trustee in delaying the administration of this estate and thereby preventing its being closed for the last year and one half to two years.

8. Had this estate been closed approximately two years to two and one half years ago, as it should have been, there would have been less duplication of effort by the Attorney for the Trustee. The duplication of effort resulting from the delayed closing of this estate was not a reasonable and necessary expense to this bankruptcy estate.

9. In Omaha, Nebraska, the minimum fee schedule of the Douglas County Bar Association provided for a minimum hourly rate of $15.00 per hour from approximately January 1, 1958, to approximately November 30, 1958, and for a minimum hourly rate of $18.00 per hour at all times since November 30, 1958.

10. A fair and reasonable fee for the Attorney for the Trustee, under all the circumstances of this case is $18,500. The reasonable and necessary expense to this estate for the services of the Attorney for the Trustee is $18,500.

## CONCLUSIONS OF LAW

Fees for the Trustee's attorney are allowable as an expense of administration under Section 62 of the Bankruptcy Act. (11 U.S.C.A. § 102). The quantum of such fees is left by the Bankruptcy Act to the sound discretion of the Court. Where the proceeding has been referred, the quantum is for the sound discretion of the Referee, and this is so, even though as in this instance, the Referee was not in office during all of the time in which the services of the Attorney were rendered. As was held by the Court in In re Valentine, 139 F.Supp. 576, 577 (D.C.Md.1956):

"As a rule discretion in the fixing of fees will be exercised primarily by the referee, subject, however, to review and reconsideration by the district judge. The referee's discretion and judgment, if free from error of law and sufficiently supported by the evidence, is entitled to great weight, even though he was not in office when the services were rendered. Collier on Bankruptcy, 14th ed., sec. 62.12, pages 1481–1483."

The reasons why such discretion is lodged in the Referee were stated by Judge Sanborn, then a District Judge, in In re American Range & Foundry Co., 41 F.2d 845, 847–848 (D.C.Minn.1926):

" * * * The business of fixing attorneys' fees in bankruptcy matters is one peculiarly for the referee. If this court should make it a practice to pass upon the question of the reasonableness of the allowances made by referees for attorneys' fees, it would mean that it would have to pass upon the question in connection with almost every large bankruptcy matter and a great many of the small ones. To leave the question to the referee tends to create uniformity of charges and allowances, while to repass upon the question here and substitute the judgment of this court for that of the referee would tend to create inequality and confusion. There is nothing more difficult nor embarrassing than to appraise the value of professional services. The appraisal must be based largely upon the personal opinion of the one who makes it. Even though an occasional injustice be done, the policy of the court must be to leave the determination of the question of the

reasonable value of such services to the judgment of the referee."

The discretion of the Referee in fixing the quantum of fees is limited in that the fees which he allows must be "reasonable." In re Owl Drug Co., 16 F. Supp. 139 (D.C.Nev.1936). But the term "reasonable" when so used has a special meaning; it refers to "reasonable" in the light of the overriding principle which governs all bankruptcy allowances and overshadows all canons— that is, the economy principle often called the "Economic Spirit of the Act." Hence, "reasonable" fees in bankruptcy are something less than fees which would be received from private clients. This is the rule in this circuit; in Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 32 F. 187, 191 (8th Cir. 1887), the Court stated the rate of compensation was fixed, "remembering that we can only allow 'fair and just' compensation * * and not that which the generosity of an absolute owner might prompt * * *." This is apparently the rule in this Court. See In re National Accessories, 13 F. Supp. 278 (D.C.Neb. 1936). And it is the rule elsewhere. See In re Owl Drug Co., supra; In re National Department Stores, Inc., 11 F.Supp. 633 (D.C.Del. 1935). At the same time, fees in bankruptcy cannot be so much less than fees in private practice that "abler members of the bar" are driven out of the field, "where their services may often be of great value to general creditors." In re Belfort Corp., 136 F.Supp. 1 (D.C.Md. 1955).

Referee Asa S. Herzog, from the Southern District of New York, and one of the most eminent and most published of all Referees, in his article, "Bankruptcy Law—Modern Trends" in 36 Journal of the National Association of Referees in Bankruptcy, pp. 56, 57, explained the relationship of the principles discussed in the preceding portion of these Conclusions of Law:

"The question of quantum is simply left to the sound discretion of the Court, and regardless of how many rules and principles are evolved, the question is always one of delicacy precisely because it is discretionary. Actually, 'discretion' does not mean that the court is at liberty to give anything more than fair and reasonable compensation. And 'reasonableness', said to be the only test in the allowance of fees, cannot be taken in its ordinary accepted meaning in this context because the criteria followed are a modification of those usually adopted by the decisions and by the ethics of the profession in determining the value of legal services. There are, accordingly, separate standards in fixing reasonable compensation for attorneys representing private clients and in bankruptcy where they act as public servants.

"In either case, there is considerable leeway in determining 'reasonableness'. It is utterly impossible to arrive at a figure with mathematical certainty and to say that this and no other figure is reasonable. The very best that can be hoped for is that the figure will fall within the *area* of 'reasonableless', that is, neither excessive nor inadequate, neither extravagant nor unjust. The sum so fixed may not still criticism from one side or the other, but at least it will not be impeachable as an abuse of discretion.

\* \* \* \* \*

"It was mentioned at the outset that the history of bankruptcy law is one of complaints about the high costs of administration. Nothing contributed so much to bring about the repeal of the Bankruptcy Act of 1867 as the entire absorption of small estates in fees. Economy in administration is now axiomatic, and without belaboring the point it is sufficient to note that the Supreme Court has denounced extravagant costs of administration as a 'crying evil' and has warned against 'vicarious generosity'.

"The importance of the economy principle is that it modifies the busi-

ness standards which ordinarily are the measure of fees. Bluntly, fees in bankruptcy cases must be considerably lower than the compensation of those engaged in private practice. The court, awarding fees out of a fund resulting from a liquidation under proceedings created principally for the benefit of creditors, cannot exercise the generosity of a grateful private client. But granted that fees in bankruptcy must be lower than those charged for comparable services in private practice, how much lower must they be to satisfy the principle of economy? Again, lacking a formula, we must fall back on 'reasonableness', that is, somewhere in the area where the fees are neither so high as to startle the judgment nor so low as to be unmindful of the dignity of the profession and forgetful of the important duty of counsel.

\* \* \* \* \* \*

"Thus despite the sound economy principle, fees should not be below a level beyond which bankruptcy practice becomes unprofitable, and while they cannot be measured by the same standards which control fees in general practice, there is clearly an inter-relationship between the two which must be maintained."

In a nutshell, therefore, the quantum of the fee to be awarded in this case is in my discretion, subject to the limitation that the fee be "reasonable"; by the term "reasonable" is meant a fee less than that which would be received from a private client and yet not so much less that abler members of the bar will be driven from the field.

Certain specific criteria have been developed as guides for determining a reasonable fee. Most frequently referred to are those criteria described by Judge Gardner of this Circuit in Levin v. Barker, 122 F.2d 969, 972 (8th Cir. 1941):

"Many elements may properly be taken into consideration in determining a reasonable fee for services rendered by the attorney. Among these may be named (1) the time spent; (2) the intricacy of the questions involved; (3) the size of the estate; (4) the opposition encountered; (5) the results obtained; and (6) the economic spirit of the Bankruptcy Act."

Additional criteria may also be considered. Where services were performed on a contingent basis, that should also be considered. In re Osofsky, 50 F.2d 925 (S.D.N.Y.1931); In re Lennox Metal Mfg. Co., 263 F.2d 891 (2nd Cir. 1959).

Another criterion which must be considered is the percentage relationship of the fee and the recovery. Even though professional services are well performed, "the only realistic course in bankruptcy collections is that allowances must be limited—as they are by customary practice—to a reasonable percentage of the recovery." Rosenberg v. United States, 242 F.2d 141 (2nd Cir. 1957).

Another criteria which may be considered is unreasonable and unnecessary delay. Although few attorneys consider delay in fixing fees for private clients, there is no doubt but that courts consider delay and procrastination in determining fees under the Bankruptcy Act. Efficiency is something to be rewarded; procrastination is something to be penalized. Prompt administration is one of the fundamental objectives of the Act. Referee Herzog has suggested that expeditiousness is a criteria which may weigh more heavily in the allowance of fees than time spent:

"\* \* \* the *per diem* charge has correctly been termed 'merely incidental'. Actually, expeditousness in bringing the administration to a successful conclusion, a factor seldom mentioned, ought to influence compensation as much as time consumed, for the Act contemplates the prompt administration of estates with the legal rights of the parties." Herzog, op. cit. at p. 58.

Unnecessary delay is recognized by Rules of Court in this Circuit as a factor

to consider in making allowances to trustees and receivers. Rule 8(m) of the Bankruptcy Rules, United States District Court for the District of Minnesota specifically provides that "in the discretion of the court, the fees of a receiver may be disallowed in whole or in part on account of such delay (due to causes within his control) * * *" Rule 9(k) of those Rules contains an identical provision for trustees.

Unnecessary delay was recognized as a reason for reducing a trustee's allowance in In re K-H Sign Manufacturing Co., 6 B.R. (N.S.) 608, 609 (D.C.Md.1925):

> " * * * the referee has based his refusal of an allowance to the trustee partly on delay in filing the account, during which time the trustee had the money upon deposit. In view of his finding that part of the delay was unnecessary and no evidence having been taken at the hearing to establish the contrary (although a reasonable explanation was offered) we feel that the referee's finding cannot be set aside * * *"

See also 6 Remington on Bankruptcy, Sec. 2736 at p. 301.

In factual situations having much in common with the one now before me, courts have often applied the foregoing criteria by placing primary emphasis on the amount which constitutes a reasonable percentage of the assets. As will be seen from these cases, a "reasonable percentage" is something less than a reasonable percentage from a private client. The fees allowed are generally in the range of from 20% to 33⅓% of the assets, the exact fee apparently being varied according to the time necessarily consumed, the intricacy of the problem, and the other criteria above mentioned.

A recent case, which is pertinent here, is In re Lennox Metal Manufacturing Company, 263 F.2d 891 (2nd Cir. 1959). There, a case which started out as a no asset case was turned into a case with $250,000 assets by litigation conducted by one of two firms of attorneys representing the trustee. In the process of that litigation, $175,000 of priority claims were dismissed. Another firm of attorneys for the trustee reduced secured claims from $90,000 to $60,000. The Court of Appeals affirmed a total award of $51,500 in fees for both firms of attorneys. It was first held that the assets against which the fee was to be measured were the $250,000 on hand, not that amount augmented by the $175,000 of priority claims dismissed. It then held that the total award being about 20% of available assets was proper.

Referee Herzog, op. cit., supra, at p. 67, had this comment on the Lennox case, and upon the relationship of fees to assets in general:

> "Where the final recovery was $250,000 in what was originally a no-asset case, subtraction of 20% from available assets was affirmed. This seems eminently fair and I suggest it as a workable guide—approximately 30% of a modest recovery and approximately 20% of a larger recovery—to be varied by time necessarily consumed, intricacy of the problem, opposition encountered and skill required and applied—this added to reasonable compensation for the professional services rendered other than in connection with recoveries."

A few other pertinent decisions should be mentioned. The Court in In re Barceloux, 9 F.Supp. 146 (N.D.Cal.1933), affirmed 74 F.2d 288 (9th Cir. 1935), had before it a case in which the assets were $125,000, with another $100,000 possible. The $125,000 had been recovered by the attorneys in what had appeared to be a no asset case. The Court approved a fee of approximately 20% of the $125,000, noting that the allowance was "well within the usual contingency fees allowed or agreed upon between parties" and that the "allowance made is a reasonable one."

One Court has remarked that in a large estate a fee of 30% is too much. See Silver v. Rosenberg, 139 F.2d 1020 (2nd Cir. 1944). Another has suggested that 40% is too large a fee, but affirmed such

an award on a technicality. See In re Goodman, 17 F.Supp. 337 (W.D.N.Y. 1936).

The Court in In re Osofsky, 50 F.2d 925 (S.D.N.Y.1936) approved an award of slightly less than 33⅓% in a transformed no asset case.

In fixing the fee at $18,500, I have been guided by the foregoing principles, criteria, and authorities. I believe it to be a reasonable fee.

The fee award amounts to a reasonable percentage of these assets. The sum recovered and available after all expenses is $64,204.79. This is the sum which has "emerged", which reflects the size of the estate, and the sum against which the fees are to be calculated. In re Lennox Metal Manufacturing Company, supra. Thus, the $18,500 constitutes approximately 29% of the assets.

This percentage places the fee well within the area of permissive percentages of assets. In fixing the fee I have attempted to allow the attorney for the trustee close to one-third of the available assets, but not quite that much. I believe, that because of various aspects of the case centering around unnecessary delay the attorney for the trustee should receive less than one-third of the assets. At the same time, because of the intricacy of the problems, time spent, opposition encountered, and contingency of the fee, I believe the fee should be close to one-third of the assets. I regard one-third of the assets as a maximum possible fee in this case.

I think it proper in this case to place little emphasis upon an hourly rate for time logged. Although the attorney for the trustee without question was required to expend a substantial amount of time performing necessary duties, I cannot help but infer, as I have done, that a not insignificant saving in time would have resulted from a more punctual performance of many of the duties. If an hourly rate is to be employed, then the court must first determine that all time against which the rate is applied was "fairly and properly" necessary to deal

with the case. In re Jocellen Realty Corp., CCH Bankruptcy Reports, #54, 378 (D.C.N.Y.1943).

The relationship of the fee awarded to the Minimum Fee Schedule in Omaha may be noted, however. The $18,500 fee is in excess of the fee that would result from applying to the time logged (all of which was not necessarily spent) the hourly rate specified in the Minimum Fee Schedule in effect in this area during the time the services were rendered, that is. $15.00 per hour for services rendered up to and including November 30, 1962, and $18.00 per hour for services rendered thereafter. A fee on this basis would amount to $13,585 at the $15.00 hourly rate and $2,355 at the $18.00 hourly rate, or a total fee of $15,940.

Also, I think it proper, to penalize the attorney for the trustee for unnecessary delay, whether that delay resulted in unnecessary time being spent or not. The Act has a primary purpose the "prompt administration of estates with the least possible delay consistent with the legal rights of the parties." Globe Paper Co. v. Morris Travis Drug Co., 112 F.2d 350 (6th Cir. 1940). To promote that purpose, a paucity of diligence should be rewarded with a commensurate paucity of fees. There is no doubt in my mind but that the diligence of the attorney for the trustee, at least after July, 1961, the settlement date of the Ramy Seed litigation, left much to be desired. It is not only my judgment that the attorney for the trustee was not diligent; from the letters in evidence it is apparent that it was also the judgment of Referee Murphy. As one of those letters shows, Referee Murphy had made so many requests for action that he was "embarrassed" to make any more. As another letter shows, I carried on the requests and finally notified Mr. McEachen that he would be removed from office if action were not forthcoming. And it is not. without significance that until the middle of 1963 In re General Contractors, Inc., B 0691, was the second oldest case on my docket, this of course being the oldest, and that the attorney for the trustee here-

was serving in the same capacity there. In fixing the fee at $18,500 I have considered the delay in this light.

I have not attached significance to the suggestion of Mr. McEachen that his delay was of benefit in forcing opposing parties to settle (apparently in desperation). That suggestion, even if true, is of no consequence. That delay may not inure to his benefit. As stated by the Court in In re Iron Clad Mfg. Co., 215 F. 877, 879 (2nd Cir. 1914):

"It is very hard to see how the proceedings in the case could with propriety so long be dragged on. Judge Mayer in his opinion suggests that the plan was deliberately to tire out the other side by delay, and there is enough in the record to justify such a conclusion. Indeed, it was even suggested at the bar of this court, though afterwards withdrawn, that it was an element for consideration in fixing an allowance that through a period of over a year, while this matter was in litigation, Elizabeth C. Seaman had been able to draw a monthly salary of $1,000 from the American Steel Barrel Company. The bar, of course, understands that, whatever a solicitor may get from clients as a return for delaying legal proceedings and wearying his antagonists, he must get it without the help of courts, who do not recognize in such services any basis whatever for a legal obligation. The courts are open to decide causes, not to obstruct them."

I have considered the testimony of Hird Stryker, expert witness, which in general is favorable to the application. There can be no question but that Mr. Stryker is an eminent attorney, well qualified as an expert. But I must differ respectfully with him with regard to this fee. I believe my intimate association with this bankruptcy and the principles heretofore announced justifies my doing so. And it is well established that in making my decision I am not controlled by uncontradicted expert testimony, but may instead rely upon his own knowledge and experience. This rule is stated by the Court in Campbell v. Green, 112 F.2d 143, 144 (5th Cir. 1940):

"Two members of the bar as witnesses testified they thought $1,000 reasonable, and it is argued this testimony must control, being uncontradicted. Such evidence is admissible but not conclusive. 5 Am.Jur., Attys. at Law, § 191, 192. The court, either trial or appellate, is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value. 7 C.J.S., Attorney and Client, § 191(d). * * *"

The same rule is also stated in In re Insull Utility Investments, Inc., 74 F.2d 510 (7th Cir. 1935) and in In re Ironclad Mfg. Co., 215 F. 877 (2nd Cir. 1914).

The absence of objection by creditors to the application is of no consequence. It is generally not practical or economically feasible for creditors to appear and oppose applications for allowances. A Referee should not favor counsel whom he sees and hears over creditors whom he does not see and hear, but who are equally entitled to protection of the Court. In re Valentine, supra. Thus it is held that "the maxim 'volenti non fit injuria,' requesting an aggrieved party to voice his complaint, if any there be, at the proper time, is better theory than it is practice and that, in fact, creditors more often than not are helpless and should be allowed to look to the Court for their protection." Collier Bankruptcy Manual, § 62.06 at p. 717 and cases cited.

The amount allowed is ample compensation for both the recovery of assets and all other work in the estate. In good conscience I cannot allow the requested fee which amounts to 40% of available assets.

A separate order in accordance with the Findings of Fact and Conclusions of Law in this Opinion will this day be entered.

As a result of the allowance of the $18,500 fee, the attorney's fees and trustee's commissions on all applications will total $21,036.07, this being approximately 33% of the $64,204.79 available. Priority claims of $16,862.61 will be paid in full. General unsecured claims will be paid a dividend of 41.65%. I think this to be just.